People ex rel. George C. Carter, Appellant, *v.* Frank
Rice, Secretary of State, Respondent.

In re Application of Hartley V. D. Horn, for a Mandamus,
Appellant, *v.* Board of Supervisors of Oneida County,
Respondent.

People ex rel. Charles F. Pond, Appellant, *v.* Board of
Supervisors of Monroe County, Respondent.

Before a court may determine that an act of the legislature is unconstitu-
tional and void, a case must be presented in which there is no reason-
able doubt; the incompatibility of the act with some provision of the
Constitution must be manifest and unequivocal.

A constitutional provision may be impliedly abrogated by the adoption of
a later one, which is clearly and unquestionably antagonistic to it,
although the original provision in terms remains unaltered.

Under the provisions of the State Constitution (Art. 3, §§ 4, 5) providing
for an enumeration of the inhabitants of the state in 1855, and at the
end of "every ten years thereafter," and for an alteration of the senate
districts and apportionment of members of assembly at "the first session
after the return of every enumeration," the power to make the alteration
and apportionment is not limited to regular sessions; but when, after the
adjournment of the regular session at which an enumeration bill is
passed, and after an enumeration thereunder, an extraordinary session
is called by the governor, and he recommends this subject for considera-
tion, such a session is the "first session" within the meaning of said
provision, and the legislature so in session has power to make the
changes and apportionment.

Where the first legislature, convened at the expiration of a ten years'
period, fails to perform the duty imposed upon it of directing an enumera-
tion, the power to direct it is not lost until the recurrence of another
ten years' period, but the duty devolves upon the next and each suc-
ceeding legislature until the constitutional mandate is obeyed.

The amendments to the State Constitution, made in 1874, which struck out
the provision denying to a colored person the right to vote, who had not
the prescribed property qualification, and relieving all those not so
qualified from direct taxation (Art. 2, § 1), and which omitted from the
provision in reference to the apportionment of members of assembly,
the clause excluding from the enumeration "persons of color not taxed"
(Art. 3, § 5), had the effect to abrogate and strike out the similar words
in the provision relating to the reorganization of senate districts.
(Art. 3, § 4.)

There is no presumption that any particular proportion of colored persons
not taxed resides in any one senate district, and unless the existence of

an unequal proportion in the different districts is proved, it may not be held that any one has been injured by a failure to exclude such colored persons from the number of inhabitants upon which senate districts are based; and as, the courts will not attempt to remedy errors that injure no one, in the absence of proof of such an unequal proportion, a court is not called upon to determine the question as to the constitutionality in this regard of an act reorganizing senate districts which does not exclude from the calculation "persons of color not taxed."

The constitutional provision (Art. 3, § 4) vesting in the legislature the power to alter the senate districts after each enumeration, and requiring this to be done so that "each senate district shall contain, as near as may be, an equal number of inhabitants," etc., grants to the legislature a discretion in carrying out the power, and the court has no jurisdiction to review the exercise of this discretion, unless it appears that it has been plainly and grossly abused (Andrews and Finch, JJ., dissenting).

Accordingly *held* (Andrews and Finch, JJ., dissenting), that the Apportionment Act of 1892 (Chap. 397, Laws of 1892) was not violative of any constitutional provision, and so, was valid.

Reported below, 65 Hun, 236.

(Argued October 4, 1892; decided October 13, 1892.)

Appeal in the first above-entitled proceeding from order of the General Term of the Supreme Court in the third judicial department, made September 22, 1892, which denied an application for a mandamus, requiring the secretary of state, to issue election notices under the Apportionment Law of 1879 (Chap. 208), and enjoining him from filing election returns under the Apportionment Act of 1892 (Chap. 397), or performing any act thereunder.

Appeal in the second above-entitled proceeding from order of the General Term of the Supreme Court in the fifth judicial department, made September 13, 1892, which affirmed an order of Special Term denying an application for a mandamus to compel the board of supervisors of the county of Monroe to forthwith convene and divide the county into three assembly districts, in accordance with said apportionment act.

Appeal in the third above-entitled proceeding from order of the General Term of the Supreme Court in the fourth judicial department, made September 13, 1892, which affirmed an order of Special Term, which denied an application for a mandamus

to compel the board of supervisors of the county of Oneida to meet and proceed to divide Oneida county into assembly districts under said apportionment act.

The facts, so far as material, are stated in the opinion of PECKHAM, J.

*E. H. Risely* and *Henry M. Love* for appellants in *People ex rel. Carter* v. *Rice.* Any citizen has the right to apply for the relief asked. (*People* v. *Collins*, 19 Wend. 56; *People* v. *Halsey*, 37 N. Y. 344; *People ex rel.* v. *Rice*, 129 id. 461.) The apportionment act was not passed at the "first session after the return" of the enumeration, and is invalid and unconstitutional. (Const. N. Y. art. 3, §§ 4, 5; *People* v. *Fancher*, 50 N. Y. 288; 1 Story on Const. §§ 406, 454; *People* v. *Wemple*, 125 N. Y. 485; *Lanning* v. *Carpenter*, 2₀ id. 447; *People* v. *Albertson*, 55 id. 50; *Newell* v. *People*, 7 id. 9.) The enumeration and the apportionment based upon it are unconstitutional and void, because "persons of color not taxed" are included. (Const. N. Y. art. 3, § 4; *Wynehamer* v. *People*, 13 N. Y. 378; 1 Story on Const. §§ 407, 409, 413, 448, 451, 453; *People ex rel.* v. *Potter*, 47 N. Y. 375, 380, 383; *People ex rel.* v. *Wemple*, 125 id. 485, 488; *Rumsey* v. *People*, 19 id. 41; *Brown* v. *Clark*, 77 id. 369; *Taylor* v. *Porter*, 4 Hill, 140, 144; *People* v. *Draper*, 15 N. Y. 532, 544; Cooley's Const. Lim. 168; *Rumsey* v. *People*, 19 N. Y. 41, 46; *Kinney* v. *City of Syracuse*, 30 Barb. 349, 360; 3 Keyes, 110; *People ex rel.* v. *Albertson*, 55 N. Y. 50, 55; *Presser* v. *Illinois*, 116 U. S. 252.) The act of apportionment does not comply with other provisions of the Constitution, and is, therefore, unconstitutional and void. (*Newell* v. *People*, 7 N. Y. 9, 118; 1 Story on the Const. §§ 505, 634, 678; *People* v. *Potter*, 47 N. Y. 375, 379, 382; *People* v. *Wemple*, 125 id. 485, 493; *People* v. *Fancher*, 50 id. 281, 288; *Kinney* v. *City of Syracuse*, 30 Barb. 349; *People* v. *Collins*, 19 Wend. 56; *Prouty* v. *Storm*, 11 Kans. 261.) The rule which has been invoked, that the court will not review questions of fact, is not applicable. (*People* v. *Draper*,

15 N. Y. 546; *Rumsey* v. *People,* 19 id. 41; *W. W. M. Co.* v. *Shanahan,* 128 id. 345; *De Camp* v. *Ereland,* 19 Barb. 81; 1 Story on Const. [3d ed.] §§ 376, 392; *People* v. *Albertson.* 55 N. Y. 50.)

*S. W. Rosendale, Attorney-General,* for respondents in *People ex rel. Carter* v. *Rice.* The enumeration of the inhabitants of the state on which the apportionment was founded, was constitutional and legal, notwithstanding the fact that it was taken in the year 1892, and not in a year the number of which ended with the figure "5." (Const. N. Y. art. 3, § 4; *Smith* v. *Jones,* 1 B. & Ad. 328; *Ex parte Heath,* 3 Hill, 42; *People ex rel.* v. *Tompkins,* 64 N. Y. 57; *Metcalf* v. *Mayor, etc.,* 17 N. Y. S. R. 97; *State* v. *Smith,* 67 Me. 328, 332; *State ex rel.* v. *Camden,* 39 N. J. L. 620; *In re Census Superintendent,* 15 R. I. 614; *R. W. & O. R. R. Co.* v. *Jones,* 106 N. Y. 330; *People ex rel.* v. *Board of Police,* 46 Hun, 296; 107 N. Y. 235; *People* v. *Fancher,* 50 N. Y. 288, 291; Story on Const. § 400; *McClusky* v. *Cromwell,* 11 N. Y. 601; *People ex rel. Potter,* 47 id. 375; *People ex rel.* v. *Angle,* 109 id. 564; *People ex rel.* v. *Wemple,* 125 id. 485, 493.) The apportionment law of 1892, is not rendered invalid, because passed at an extraordinary session of the legislature, held in 1892, subsequent to the return of the enumeration. (Const. N. Y. art. 3, § 4; *Rumsey* v. *People,* 19 N. Y. 41; *People* v. *Fancher,* 50 id. 288; *People* v. *Lippincott,* 64 Ill. 256.) The objection that the senate apportionment is unconstitutional because, in estimating the number of inhabitants in the senate districts, the legislature did not, and were not furnished with any information whereby it could exclude from representation "persons of color not taxed," is not well taken. (Laws of 1892, chap. 397; *Wynehamer* v. *People,* 13 N. Y. 342; *Presser* v. *Illinois,* 116 U. S. 252; *P. Co.* v. *City of Keokuk,* 95 id. 80; *Pennyman's Case,* 103 id. 714–717; *Unity* v. *Burrage,* 103 id. 459; *Trade-Mark Cases,* 100 id. 82; *Baldwin* v. *Franks,* 120 id. 679; *Murdock* v. *City of Memphis,* 20 Wall. 590; *Lyddy* v. *L. I. City,* 104 N. Y.

218; *Slaughter-house Cases*, 16 Wall. 36; *People* v. *King*, 110 N. Y. 410; *Neal* v. *Delaware*, 103 U. S. 370; *Rumsey* v. *People*, 19 N. Y. 42; *People ex rel.* v. *Dayton*, 55 id. 367.) The alteration of the senate districts, and the " apportionment " of members of the assembly, among the several counties, by chapter 397, Laws of 1892, was legally made. (*I. & S. L. R. R. Co.* v. *Horst*, 3 Otto, 300; *Reed* v. *Smith*, 42 Col. 251; *Prouty* v. *Storm*, 11 Kansas, 261; *People ex rel.* v. *Durston*, 119 N. Y. 569; *W. W. M. Co.* v. *Shanahan*, 128 id. 345, 360; *Rumsey* v. *People*, 19 id. 42, 47, 48; *People* v. *Albertson*, 55 id. 50; *In re N. Y. E. R. R. Co.*, 70 id. 327; *Amy* v. *Watertown*, 130 U. S. 319; *People* v. *Draper*, 15 N. Y. 532.) The act of altering the senate districts, and apportioning members of the assembly by the legislature, is not within the power of the judiciary to review. (*Marbury* v. *Madison*, 1 Cranch, 67; *Kilbourn* v. *Thompson*, 103 U. S. 168; Cooley on Const. Lim. [6th ed.] 192; *People ex rel. McLean* v. *Flagg*, 46 N. Y. 401; *W. W. M. Co.* v. *Shanahan*, 128 id. 345–360; *People* v. *Albertson*, 55 id. 50; *In re N. Y. E. R. R. Co.*, 70 id. 327; *People ex rel.* v. *Durston*, 119 id. 569; *Amy* v. *Watertown*, 130 U. S. 319.) The court ought not to declare the act unconstitutional. (*Rumsey* v. *People*, 19 N. Y. 42; *Amy* v. *Watertown*, 130 U. S. 319; *Sharpless* v. *Mayor, etc.*, 21 Penn. St. 147.)

*H. J. Cookingham* for appellant in *People ex rel. Horn* v. *Supervisors*. Mandamus is the proper proceeding to compel a board of supervisors to perform a duty required by law. (*People* v. *Suprs.*, 8 N. Y. 317; *People* v. *Suprs.*, 34 id. 268; *People* v. *Schiellein*, 95 id. 134.) A peremptory mandamus may issue in the first instance where the applicant's right to the writ depends upon questions of law only, and notice has been served upon the defendant. (Code Civ. Pro. § 2070; *People* v. *R., W. & O. R. R. Co.*, 103 N. Y. 95.) To proceed to a hearing without traversing the averments in the relator's affidavit admits the truth of the averments and is equivalent to a demurrer. (*People* v. *St. Lawrence Co.*, 103 N. Y. 541.) A

citizen of the county has sufficient interest in the performance of a duty imposed upon the board of supervisors to institute proceedings for mandamus. (*People* v. *Sullivan Co.*, 56 N. Y. 249 ; *People* v. *Halsey*, 37 id. 344 ; *People* v. *Rice*, 129 id. 449.) The act known as chapter 5 of the Laws of 1892, which provides for an enumeration of the inhabitants of the state, is constitutional. (Const. N. Y. art. 3, § 4 ; *Rumsey* v. *People*, 19 N. Y. 41 ; *People* v. *Cook*, 14 Barb. 259 ; *People* v. *Cook*, 8 N. Y. 67 ; *Ex parte Heath*, 3 Hill, 42 ; *Bank of Chenango* v. *Brown*, 26 N. Y. 467 ; *People ex rel.* v. *Board of Police*, 107 id. 235 ; *People ex rel.* v. *Thompkins*, 64 id. 53 ; *People* v. *Allen*, 6 Wend. 486.) The report of the enumeration of inhabitants made by the secretary of state to the legislature, furnished the proper evidence upon which to act in fixing the senate districts and apportioning members of assembly among the counties of the state. (*Lanning* v. *Carpenter*, 20 N. Y. 417 ; *DeCamp* v. *Overseer, etc.*, 19 Barb. 81.) It was not necessary to make a separate enumeration of colored citizens not taxed, for the reason that this requirement of the State Constitution is in conflict with the Constitution of the United States. (*Neal* v. *Delmore*, 103 U. S. 370 ; *Strauder* v. *West Virginia*, 100 id. 303 ; *People* v. *King*, 110 N. Y. 416 ; *Wynehamer* v. *People*, 13 id. 378–440 ; *P. Co.* v. *City of Keokuk*, 95 U. S. 80 ; *Unity* v. *Burrage*, 103 id. 447, 459.) The act, chapter 397, Laws of 1892, organizing the senate districts and for appointment of members of assembly among the counties of the state is constitutional. (*People ex rel.* v. *Potter*, 47 N. Y. 375 ; 49 Mo., 215 ; *People* v. *Fancher*, 50 N. Y. 288.) The court cannot say that the apportionment bill is unconstitutional, for the reason that the division of the state into senatorial districts was unfairly made. (*Rumsey* v. *People*, 19 N. Y. 41–49 ; *People* v. *Lawrence*, 36 Barb. 177 ; *United States* v. *Williams*, 5 McLean, 133 ; *People ex rel.* v. *Durston*, 119 N. Y. 569 ; *Prouty* v. *Stover*, 11 Kan. 261.) All intendments must be taken in favor of the validity of statutes, and " before a court will deem it their duty to declare an act unconstitutional, a case must be presented in which there is no rational doubt."

(*Ex parte McCollum*, 1 Cow. 550 ; *Rich* v. *Flanders*, 39 N.
H. 304 ; *H. B. Co.* v. *U. F. Co.*, 29 Conn. 210 ; *People ex
rel.* v. *Briggs*, 50 N. Y. 553 ; *Kerrigan* v. *Force*, 68 id. 381 ;
*Speer* v. *School Directors*, 50 Penn. St. 150 ; *Mayor, etc.*, v.
*State*, 15 Mary, 376 ; *People* v. *Draper*, 15 N. Y. 532 ; *Amy*
v. *Watertown*, 130 U. S. 319.)

*J. I. Sayles, W. E. Scripture* and *D. F. Searle* for respond-
ents in *People ex rel. Horn* v. *Supervisors, etc.* It is con-
ceded that if it were the duty of the board of supervisors of
Oneida county to obey chapter 397 of the Laws of 1892, the
appellant had the right to institute and maintain this proceed-
ing, and upon his relation the court had power to compel the
performance of that duty by mandamus. (*People ex rel.* v.
*Halsey*, 37 N. Y. 644 ; *People ex rel.* v. *Bd. Suprs.*, 56 id.
249 ; *People ex rel.* v. *Common Council*, 77 id. 503 ; *People
ex rel.* v. *Rice*, 129 id. 401 ; *People ex rel.* v. *Rice*, Id. 449.)
The legislature has not the inherent power to take an enumera-
tion or make an apportionment. (Const. N. Y. art. 3, § 1 ;
*Kilburn* v. *Thomson*, 103 U. S. 168 ; *People ex rel.* v. *Keeler*,
99 N. Y. 477.) The legislature is a creature of the Consti-
tution. (*People ex rel.* v. *Allen*, 42 N. Y. 404 ; *People* v.
*Bd. Education*, 13 Barb. 400 ; *Taylor* v. *Porter*, 4 Hill, 140 ;
*DeCamp* v. *Carpenter*, 20 N. Y. 447 ; *People* v. *Gilson*, 109
id. 389.) The act of the legislature requiring the board of
supervisors to meet on the third Tuesday of July, 1892, and
divide the county of Oneida into two assembly districts, known
as chapter 397 of the Laws of 1892, is unconstitutional and void.
The alteration of the senate and assembly districts therein made
was not based upon an enumeration of the inhabitants taken
in conformity with section 3, article IV of the Constitution,
which requires such enumeration : " In the year 1855, and at
the end of every ten years thereafter." (*People ex rel.* v.
*Dayton*, 55 N. Y. 367 ; *Lanning* v. *Carpenter*, 20 id. 453 ;
*DeCamp* v. *Ereland*, 19 Barb. 87 ; *Kinne* v. *City of Syra-
cuse*, 3 Keyes, 111.) The division of the state into senate
districts was not made by excluding " aliens and persons of

color not taxed," as required by the Constitution. (Const. N. Y. art. 3, § 4.) The apportionment was in violation of the constitutional provision that such apportionment shall be "at the first session after the return of every enumeration." (N. Y. Const. art. 10, § 6 ; Laws of 1826, chap. 280.) The words "at the first session after the return of every enumeration," as used in the Constitution, do not permit an apportionment to be made at an extraordinary session. (Const. N. Y. art. 4, § 4 ; *Purdy* v. *People,* 4 Hill, 384; *People* v. *Hyde,* 89 N. Y. 12 ; *Page* v. *Allen,* 58 Penn. St. 338 ; *Slate* v. *Barnes,* 24 Fla. 29 ; *McKoan* v. *Devries,* 5 Barb. 196.) The senate districts as constituted in such act are not so altered that " each senate district shall contain as near as may be an equal number of inhabitants." And the members of assembly are not proportioned among the several counties of the state as nearly as may be according to their respective inhabitants, as required by sections 4 and 5, article III. (*State* v. *Cunningham,* 51 N. W. Rep. 724.) The legislature had no constitutional warrant to convene in extraordinary session and no power or jurisdiction to enact any law at the so-called extraordinary session. (Const. art. 4, § 4 ; *People* v. *Fancher,* 50 N. Y. 259.)

*C. D. Kiehl* for appellants in *People ex rel. Pond* v. *Supervisors.* The writ of mandamus is the proper remedy in this case sued out at the relation of a citizen and elector of the city of Rochester. (*People ex rel.* v. *Supervisors,* 56 N. Y. 249 ; *People ex rel.* v. *Halsey,* 37 id. 344; *People ex rel.* v. *Rice,* 129 id. 449 ; *People ex rel.* v. *Rice,* Id. 461.) The court has the power to compel the board of supervisors to perform the duties required of them in section 3 of the apportionment act, chapter 397 of the Laws of 1892. (*People* v. *Supervisors,* 8 N. Y. 330; *People* v. *Supervisors,* 34 id. 268; *People* v. *Schiellein,* 95 id. 134.) The enumeration taken pursuant to chapter 9 of the Laws of 1892 was constitutional. (*McPherson* v. *Leonard,* 29 Md. 327 ; *Hill* v. *Boyland,* 40 Miss. 618 ; *Miller* v. *State,* 3 Ohio, 375 ; *People* v. *Supervisors,* 8 N. Y. 328.) The apportionment act was not passed at the same ses-

sion during which said enumeration was returned, but at the first session after the return thereof. (*People* v. *Fancher*, 50 N. Y. 288; *State* v. *Cunningham*, 5 N. W. Rep. 740; Cooley on Const. Lim. 54.) The apportionment act is not unconstitutional upon the ground that it is based upon an enumeration prepared and reported by the secretary of state to the legislature, in which "persons of color not taxed" are included. (*United States* v. *Reese*, 92 U. S. 214; *United States* v. *Cruikshank*, Id. 542; *People* v. *Snyder*, 41 N. Y. 403.) The apparent inequalities in the apportionment of members of assembly and senators, is a question of fact within the discretion of the legislature and cannot be reviewed by this court. (*Arnold* v. *Reese*, 18 N. Y. 57, 67; *Rumsey* v. *People*, 19 id. 48; *Supervisors* v. *People*, 7 Hill, 505, 511; *People* v. *Draper*, 15 N. Y. 533, 545; *Prouty* v. *Stover*, 11 Kan. 261.)

*S. W. Rosendale, Attorney-General,* for appellant in *People ex rel. Pond* v. *Supervisors.* The schedule on which the argument against the validity of the senate districts is predicated will not be considered by the court on the questions here presented. (*In re N. Y. E. R. R. Co.*, 70 N. Y. 327; *People ex rel.* v. *Durston*, 119 id. 569; *Amy* v. *Watertown*, 130 U. S. 319.) The objection made to the apportionment of assembly districts because of the point as to "persons of color not taxed," not being excluded from the computation, is not appealable. (Const. N. Y. art. 3, § 5.)

*W. A. Sutherland* for respondent in *People ex rel. Pond* v. *Supervisors.* Monroe county was defrauded in the apportionment of 1892 and has the right to insist that the old apportionment shall stand until a new one shall do her justice. (*Bd. of Suprs.* v. *Baker*, 52 N. W. Rep. 954.) The court will not by mandamus compel the supervisors to comply with a direction of the legislature which leads to any violation of the Constitution. (*People ex rel.* v. *State Canvassers*, 129 N. Y. 360.) Under the census of 1892, Monroe county is absolutely entitled to four assemblymen. (*McCulloch* v.

*Maryland,* 4 Wheat. 327; *People ex rel.* v. *Canaday,* 73 N. C. 198; *Darby* v. *Wilmington,* 76 id. 133.) The apportionment is void because it was had at the same session which provided for, and which received the returns from the enumeration, and hence, before the "first session after the returns of" the enumeration. (Const. art. 3, §§ 4, 5; *People* v. *Fancher,* 50 N. Y. 290; *Lanning* v. *Carpenter,* 20 id. 447; *Rumsey* v. *People,* 19 id. 41; *Smith* v. *People,* 47 id. 341; *Kinney* v. *City of Syracuse,* 30 Barb. 367; 3 Keyes, 110; Cooley on Const. Lim. 64; *Page* v. *Allen,* 58 Penn. St. 338; *Murphy* v. *Barnes,* 24 Fla. 29; *People* v. *Albertson,* 55 N. Y. 50.) The apportionment of 1892 was void because not based upon a constitutional census or enumeration. (142 Mass. 604; *Lanning* v. *Carpenter,* 20 N. Y. 447; Cooley on Const. Lim. 90; *Kilburn* v. *Thompson,* 103 U. S. 168; *Murphy* v. *Barnes,* 24 Fla. 29; *Brown* v. *Goben,* 122 Ind. 113.) The Constitution expressly prohibits any reapportionment except one based upon a census taken in a year ending with the figure 5. (Const. N. Y. art. 3, § 5; *Kinney* v. *City of Syracuse,* 3 Keyes, 110; *People* v. *Morrell,* 21 Wend. 563; *Newell* v. *People,* 7 N. Y. 9; *People* v. *Albertson,* 55 id. 50.) The senate apportionment is unconstitutional because in estimating the number of inhabitants in the new senate districts, the legislature did not and were not furnished with any information whereby they could exclude from the basis of representation "persons of color not taxed." (Const. N. Y. art. 2, § 1.) If the apportionment of 1892 can be sustained, it follows that a new census can be taken in any year of grace, without regard to the ten year space which the Constitution says must stand between each census. It follows that the same legislature which provides for the enumeration may also attend to the apportionment, instead of the one meeting in January of the following year. (*McCullock* v. *Maryland,* 4 Wheat. 327.)

Peckham, J. All these proceedings have for their object the decision of the question as to the validity of the Apportion-

ment Act of 1892. The boards of supervisors of the counties of Monroe and Oneida are the only boards in the state which have refused to make a division of their counties into assembly districts for the purpose of carrying out the provisions of the act of 1892.

The secretary of state has issued and delivered to the clerk of Oneida county an election notice in which provision is made for the election of but two members of assembly therein, and the supervisors claim the right of the electors of the county to elect three members under the Apportionment Act of 1879, and therefore it is specially asked that the secretary be compelled to issue notices for the election of three members of assembly in the county of Oneida, pursuant to the apportionment contained in the law of 1879, and that the secretary be commanded to desist from doing any act or thing under chapter 379, of the Laws of 1892, or to in any way recognize that act as valid or binding.

This apportionment of 1892, it is alleged, violates the provisions of the Constitution in several particulars which are set forth, and the court is called upon at the instance of all parties to these litigations, to decide the questions involved at the earliest practicable moment in order that the supervisors and the election officers may be guided in the discharge of their duties by the opinion of this court as to the validity of the act of 1892.

We have given all the consideration possible to these cases since the argument thereof, and while the questions are in themselves most important and far reaching, yet we are compelled by the necessities of the case to decide them at once. We, however, feel more competent to do this because however important the questions may be we think the proper and correct answers are quite plain and clear.

The rule which has governed courts ever since the adoption of our constitutions, both federal and state, in relation to the exercise of the power to declare an enactment of the legislative body unconstitutional, has been laid down in many reported cases and has been rigidly adhered to by both the

federal and state courts.   Before courts will deem it their duty to declare an act of the legislature void as in violation of some provision of the Constitution, a case must be presented in which there can be no rational doubt.   The incompatibility of the legislative enactment with the Constitution must be manifest and unequivocal.   Judge Denio, in *People* v. *Draper* (15 N. Y. 546), expressed the rule in substantially the above language.   There is no doubt of its correctness and I have heard no counsel who have challenged it.   We must proceed to the examination of the constitutionality of the act of 1892, guided by this rule.

Section 4 of article 3 of our State Constitution reads as follows : " An enumeration of the inhabitants of the state shall be taken under the direction of the legislature in the year one thousand eight hundred and fifty-five, and at the end of every ten years thereafter ; and the said districts shall be so altered by the legislature at the first session after the return of every enumeration, that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed ; and shall remain unaltered until the return of another enumeration, and shall at all times consist of contiguous territory ; and no county shall be divided in the formation of a senate district, except such county shall be equitably entitled to two or more senators."

Section five of the same article, after providing for 128 members of assembly, continues :   " The members of assembly shall be apportioned among the several counties of the state by the legislature, as nearly as may be, according to the number of their respective inhabitants, excluding aliens, and shall be chosen by single districts.   *   *   *   The legislature at its first session after the return of every enumeration, shall apportion the members of assembly among the several counties of the state, in manner aforesaid," etc.   The apportionment and districts must remain unaltered until another enumeration shall be made as provided in the Constitution.

First. It is contended on the part of those who allege the invalidity of the law of 1892, that it was passed in violation of

that provision of the Constitution which directs the alteration to be made by the legislature at the "first session after the return of every enumeration."

The act was in truth passed at an extraordinary session of the legislature called by the Governor, and after the return of the enumeration of 1892. The point is made that an extraordinary session is not such a session of the legislature as is contemplated by the Constitution. To my mind the objection is wholly without force. An extraordinary session is, nevertheless, a session of the legislature. The Governor, by the terms of the Constitution, has "power to convene the legislature (or the senate only) on extraordinary occasions." When thus convened, is not the legislature in session? And can it be for a moment correctly contended that a session thus convened is the same session which had already terminated by an adjournment without day? It is not a regular session, it is true; it is what the Constitution describes it, an extraordinary session, but yet a session of the legislature. The Constitution does not say that the session which is to deal with the question must be a regular one. All it directs is that the legislature at the first session after the return shall proceed to make the alterations. The Constitution provides for the assembling of the legislature on the first Tuesday in January in each year. When it adjourns *sine die*, has not the session of the legislature ended? The term of office of its members may not have ended, but the legislative session has certainly terminated by an adjournment without day. It could not again assemble and perform any valid act unless the Governor, under the special power given him by the Constitution, should convene it. When thus convened the legislature is in session, and it is clearly not the same session which was ended by a prior adjournment thereof without day. The Constitution does not provide that the next *legislature* after the return of the enumeration at its first session shall make this apportionment. It is directed to be made by the legislature at the first session after such return. Wherein does this extraordinary session fail to fill that description? It was a session of the

legislature and it was the first which was held after the return of the enumeration, and it was competent to deal with that subject because of the recommendation of the Governor.

There is no basis, in the language of the Constitution, for the claim that the session of the legislature referred to in that instrument is the first session of the legislature which itself first convenes after the return of the apportionment. The Constitution does not say so, and I fail in finding any reason in principle or in the nature of the subject which calls for such a construction. On the contrary, to so construe it is to arbitrarily supply words which are not used and which neither the context nor the surrounding circumstances call for. Such construction also twists and distorts the ordinary and plain meaning of the language actually employed. The result is that in order to construe the Constitution in the manner desired, words must be supplied which have not been employed and the language actually used must be construed as meaning something different from the meaning ordinarily given to it.

This court is not prepared to make such an attempt.

We also fail entirely to see the force of any argument based upon the assertion that the Constitution intended that some considerable interval should elapse between the return of an enumeration and the apportionment of senators and members of assembly under it. There is nothing whatever in the language of the Constitution which assumes or seems to provide that any material interval ought to pass after the return of the enumeration and before the enactment of the statute. On the contrary, the language of that instrument with regard to this provision would seem clearly to point to definite and prompt action at the earliest practicable moment; in other words, action at the first session of the body that can make the alteration. Such language is not that which would be used for the purpose of advising or directing delay.

Judicial notice may be taken of the fact that an enumeration of the inhabitants of the state was ordinarily a matter that occupied some time to complete it, and the members of the constitutional convention of 1846, as well as the people,

knew that it might, and in all probability it frequently would, happen that the legislature which ordered the enumeration would complete its other business and adjourn without day before the enumeration provided for was itself completed.  In such event the legislature not being in session, could not apportion the districts and members.  In order, however, to insure prompt action upon the matter and at the earliest opportunity, the Constitution provides for the alteration consequent upon an enumeration at the first session after its return.  I think that under this constitutional provision the legislature which ordered the enumeration might remain in session until after its return and then itself proceed to the alteration made necessary by the results of such enumeration.

It would seem to be a complete perversion of the ordinary and plain meaning of language to change what on its face is clearly a direction for prompt action, into one providing for or securing delay.  There is nothing in the nature of the subject which calls for it.  On the contrary, as these alterations are to last but ten years before an enumeration is again presented for another alteration, every intendment would point to the prompt and speedy fulfillment of the constitutional duty, so that the legislature should at once represent the people of to-day and not those of years ago.

An argument in favor of that construction of the Constitution which would cause a delay in making alterations after an enumeration has been returned, is suggested in the fact that an examination of the different returns might reveal some great mistake or a gross fraud, and to such an extent that no alteration of a previous apportionment ought to be based upon such an enumeration.  It is, of course, true that mistakes are possible, and it is conceivable that a fraud might possibly be perpetrated in some portion of the state.  The idea, however, that the Constitution looks to any delay in legislative action following the enumeration, because of such possibilities, finds no lodgment in the language used in the instrument itself. Such possibilities attach to all human affairs and would be the accompaniment of the second as well as of a first enumera-

tion.   But the possibilities of any error or fraud which would
really work any material injustice are so remote, both as to
perpetration and discovery, that an argument for delay based
upon them can have no weight whatever when brought before
and compared with the plain language of our fundamental
law.   The argument for an interval of time is also answered by
the fact that the legislature might provide for taking an
enumeration in November or December, and the filing of the
returns in the last of the month of December.   The incoming
legislature, which might meet in a day or two thereafter, is
concededly competent to deal with the subject.   And yet
in such case there would be no material interval of time pro-
vided for or existing.

Another argument against regarding the extraordinary
session of the legislature as competent to deal with this sub-
ject, consists in the assertion that if such a session can be
claimed to fill the conditions of the Constitution, it would in
that event rest with the Governor whether an apportionment
act should be then passed, for he might call an extraordinary
session and not recommend the consideration of this subject,
and if he did not, the legislature, it is said, could not pass an
apportionment act, although the extraordinary session were
the first session after the return of the enumeration.   If the
Governor should call such a session and not recommend this
subject for consideration, it might then be a question which
of the two constitutional provisions should prevail, that which
provided for the passage of the apportionment act at the
first session, or the one which provided that at an extraordi-
nary session the legislature should consider no other subject
than such as should be recommended to it by the Governor.
If the former provision should be held to prevail, the act
could be passed, and if the latter, it could not.   In such case
the extraordinary session would not be the first session of the
legislature within the meaning of the Constitution.   Admit-
ting that unless the Governor recommended the consideration
of the subject to the legislature at the extraordinary session
called by him, an apportionment act could not then be

passed, it by no means follows that the legislature could not pass the act at such extraordinary session, provided the subject were recommended to its consideration by the Governor. In the one case the extraordinary session is not the first session after the return of the enumeration within the meaning of the Constitution, and in the other case it is. This is only saying that when a legislature which has ordered an enumeration adjourns without day before the return thereof, the first session of the legislature after the return of the enumeration will not occur until the regular legislative session provided for by the Constitution, unless the Governor should call an extraordinary session, but that if the Governor after a return of the enumeration should choose to exercise his constitutional power and convene the legislature in extraordinary session and recommend the subject of the apportionment to it, such extraordinary session would have the constitutional power to deal with the subject. There is nothing either dangerous or in the slightest degree calculated to awaken the fears of the friends of good government in holding that such a session of the legislature is, under the circumstances stated, fully competent to deal with the subject. And the holding is itself plainly called for by the language of the instrument under consideration.

Again the fact that the public printer has for many years included in one volume the laws passed at the regular and at extraordinary sessions of the same legislature, and indorsed the volume as containing the laws passed at the ninety-first or other regular session, taking no note of the extraordinary session, is not of the least consequence. For convenience of indorsement or for reference to a volume, the regular and extraordinary session may be regarded as the same, but their inherent difference as separate sessions of the legislature cannot be obliterated, and the fact that they constitute two sessions cannot be expunged by any action of the printer or of a state officer. No court in this state has decided the proposition that an extraordinary session of the legislature, which was the first session thereof after the return of an enumeration,

could not pass an apportionment act.   The language of Judge DENIO, in *Lanning* v. *Carpenter* (20 N. Y. 453), as to the lack of power of the  legislature to alter the assembly, senate or judicial districts until the session of the legislature commencing in 1856, was evidently based upon the assumption that the return of the enumeration was not to be made until the commencement of that session.   In such case the legislative session of that year would be the first session after the return of the enumeration.   The case does not hold, or pretend to hold, that the legislature of 1855 could not have provided for an earlier return of the enumeration, which might then have been acted upon by the regular session of the legislature, if then in existence, or at an extraordinary session thereof called by the Governor and actually in session before January 1, 1856.   That question was not before the court and received no consideration at the hands of the learned judge.

We think there is no force in the several objections made as to the extraordinary session not being the first session of the legislature.

Second. The act is alleged to violate the Constitution because based upon an enumeration taken in 1892, instead of 1885.   It is true that it was the duty of the legislature in 1885 to direct an enumeration of the inhabitants of the state in that year, and if it had discharged that duty it would have been the duty of the legislature at the first session after the return of that enumeration to proceed to apportion the members of assembly and to alter the senate districts. The legislature of 1885 omitted to perform the duty of directing an enumeration which was cast upon it by the Constitution.   Each succeeding legislature up to 1892 also omitted to perform this duty, and thus for several years the constitutional mandate had been violated. It is wholly immaterial to discuss the reason for such omission. It is clear that it should not prevent the  performance of the duty by the next succeeding legislature.   The provision of the Constitution is so far mandatory that we can say the legis-

lature of 1885 ought to have complied with it by directing the enumeration, yet as it did not, the duty continued and the power of the next legislature to deal with the subject cannot be disputed upon any well founded principle. And this duty continued and was cast upon each succeeding legislature until the constitutional obligation was fulfilled. The same may be said of the obligation to make the apportionment. If it be not made at the first session after the return of the enumeration, the duty to make it devolves upon the legislature at the next and each following session, until the duty is performed. It cannot be tolerated that a legislature, by a mere omission to perform its constitutional duty at a particular session, could thereby prevent for another ten years the apportionment provided for by the Constitution. The apportionment made in 1879, which the Oneida board of supervisors asks us to still enforce, was itself not made by the legislature at the first session after the return of the enumeration of 1875. In the case of *Rumsey* v. *People* (19 N. Y. 41), the learned judge, delivering the opinion of the court, says the apportionment is valid, although not passed at the first session after the enumeration. It would seem as if authorities should not be required upon such a proposition.

Here is a plain duty imposed upon a legislature and it wholly fails to perform it. The Constitution does not in terms limit the performance of this duty to the particular legislature. It is a duty which in its very nature and essence is continuous. If the first legislature fail to perform it, can it be that, upon a subject of this kind, such failure shall be sufficient to thereafter prevent the performance of the constitutional mandate for the whole decennial term? There is, as it seems to us, neither sense nor principle upon which to base so extraordinary a proposition.

Because the duty has been omitted for one year, we think it rests with accumulated force upon the next and each subsequent legislature until it has been performed. It is of a nature which requires performance, and it is to the interests of the whole people that it should be performed as directed, and if

not at that time, then at the earliest possible moment there-
after.    We are of opinion that the objection made has no color
of validity.

Third.    A third objection is raised to the validity of this
act.    It is stated that, as to the senate districts, it is not based
upon an equal number of inhabitants, excluding "persons of
color not taxed."

One answer to this objection is offered by stating that these
proceedings have reference to the invalidity of assembly dis-
tricts only, and that in the provision of the Constitution for
their formation it is not required to exclude from the enumera-
tion persons of color not taxed.

We are inclined to the view that the act of apportionment
is so closely connected as a whole that if the senate districts
are based upon an absolutely unconstitutional enumeration,
and to such an extent that it can be judicially seen that great
injustice to many of the inhabitants of the state is the neces-
sary and unavoidable result of such an enumeration, we can-
not separate the assembly from the senate district, and the
whole act must go down.

The objection itself is one which in its nature appears to be
most ungracious.    It urges a ground of invalidity which, if
allowed, strikes out from the senate constituency all colored
citizens who are not taxed.    These men, it is claimed, must not
be counted as inhabitants of the state for the purpose of creat-
ing senate districts.    Since the adoption of the amendments to
our Constitution in 1874, this view of the law, which is now
urged with so much eagerness, has not been regarded as the
true one.

The law which provided for the enumeration in 1875, did
not contain any direction to separate persons of color into two
classes, those who were and those who were not taxed, and to
exclude the latter as a basis of apportionment, nor did the
Apportionment Act of 1879 itself provide for the exclusion
of persons of color not taxed, in making up the senate districts.
This, of course, is not in any way conclusive of the question,
although perhaps of some importance as a legislative interpreta-

tion made by two different legislatures and almost immediately after the adoption of the amendments of 1874.

We think, however, there is an answer to the objection, which we will now proceed to give. From the earliest period of our state history up to 1874, a discrimination of some kind was made against the negro in regard to his right to vote.

By the Constitution of 1777, which created a property qualification as a condition of voting; the negro then being in a state of slavery was unable to comply with its provisions, and hence was unable to vote. In 1821, although a property qualification, or its assumed equivalent, was imposed upon all citizens as a condition of voting, yet it was made more onerous in the case of colored citizens, and such citizens were exempted from taxation, unless seized and possessed of a certain prescribed amount of real estate.

In the Constitution of 1846, no property qualification, as a condition of voting, was imposed upon the white citizen, but it was therein provided that "no man of color, unless he shall have been for three years a citizen of this state, and for one year next preceding any election shall have been seized and possessed of a freehold estate of the value of $250 over and above all debts and incumbrances charged thereon, and shall have been actually rated and paid a tax thereon, shall be entitled to vote at such election. And no person of color shall be subject to direct taxation, unless he shall be seized and possessed of real estate as aforesaid." (Constitution of 1846, § 1 of article 2.)

Here was, among other things, a property condition annexed to the exercise of the right to vote on the part of a colored person.

The meaning of the exclusion in sections 4 and 5 of article 3 of the Constitution of 1846, is at once plain when the above fact is considered.

In order to vote, a colored person had to be taxed as provided for in the Constitution, and unless he was the owner of a certain amount of real estate, he was exempt from all direct taxation. Here then was a class of colored persons which, by

the terms of the Constitution itself, was exempt from the taxation therein spoken of. And when the Constitution, in the subsequent article (3), speaks of "persons of color not taxed," it clearly and without doubt refers to the colored persons not taxed as provided for in the preceding article limiting their right to vote, and providing for their exemption from direct taxation, unless owners of real estate as prescribed in the same article.

The framers of the Constitution evidently thought that persons of color, who were not entitled to vote, ought not to be counted in making up the number of inhabitants upon which to base the alteration of senate districts and the apportionment of members of assembly.

The Constitution remained for many years in this condition both as to the formation of senate and assembly districts and as to the right of the colored persons to vote. While it so remained, the war of the rebellion commenced and came to an end. Before 1874 the 13th, 14th and 15th amendments to the Federal Constitution were ratified and their adoption duly proclaimed.

Those amendments showed the great change which had come over the public mind in this country relative to the rights of the colored person. Slavery had been banished from the land by virtue of one of these amendments, and the right of the colored person to vote was treated of by the last of such amendments and the right was not to be denied or abridged by the United States or by any state on account of race, color or previous condition of servitude. I allude to these amendments only for the purpose of showing the trend and strength of the sentiment of the people of the north and also of this state upon the subject embraced in those amendments. History shows that this state was one of the ratifying parties to all of them, and their adoption by this and the other states shows that in the public estimation the time had passed when a man's color should be permitted to disqualify him from the exercise of any political rights or privileges.

All these amendments to the Federal Constitution had been

ratified and adopted before the proceedings ending in the adoption of certain amendments to our own Constitution were inaugurated.    The amendments to our State Constitution passed two legislatures consisting of different senates, and were submitted to the people and adopted by them in the fall of 1874.    The first section of article two was amended by omitting the condition for the exercise of the elective franchise by the colored person, so that his right to vote was from that time placed upon the same foundation as that of the white inhabitant.    The condition that he must be the owner of real estate to the amount of $250, and actually taxed thereon, disappeared and with it also disappeared all legal distinction between colored persons into those taxed and those not taxed.

An amendment to the fifth section of article three was at the same time submitted to the people and adopted, and the clause providing for the exclusion of persons of color not taxed was omitted from the section as adopted.    In some way not affecting this question the amendment to section four of the same article striking out the exclusion as to senate districts regarding persons of color not taxed, was not submitted to the people, and hence in words that section remains as it was. Does the section therefore still demand the exclusion of persons of color not taxed?    I think not.    It will be remembered that the plain meaning of the phrase in the two sections regarding the enumeration, as the Constitution stood at the time of its adoption as a whole, was that the legislature was to exclude from the inhabitants persons of color not taxed, as provided for in article 2, section 1 of the same Constitution. That section did provide both in regard to their taxation before being permitted to vote and also as to their exemption from direct taxation, and hence when a subsequent section alludes to persons of color not taxed, it naturally, if not necessarily, follows that it means by the use of such an expression the persons of color not taxed as already provided for in the same instrument.    And when by amendment the provision which is thus referred to is stricken out, does not such exclu-

sion impliedly abrogate the provision which was based upon the part thus dropped out ? I think it does in a case like this where the reason for the continued existence of the provision in the 4th section of article 3, has been wholly taken away by the amendment already made to the 1st section of article 2.

A repeal by implication is not favored even in regard to a statute, still less can it be favored in regard to any provision of our organic law. It is, however, a question of intention in both cases. The power that made can unmake.

A constitutional provision can be impliedly abrogated by the adoption of another and later one which is antagonistic to it, although the original provision may in terms remain unaltered. The later will of the people constitutionally made known must in such case take the place of the other provision, even though it may still in form remain in the organic law as a part thereof. It can only be said that in the case of the constitutional amendment, the fact of its opposition to a former provision and the intent to displace it by the amendment adopted must be so plainly shown by the provisions themselves that there can be no rational doubt in regard to it. I think these conditions are entirely filled by the proof showing the adoption of the amendments to section 1 of article 2, and to section 5 of article 3. I have no manner of doubt that the people intended by the adoption of these amendments to effectually blot out all distinctions of a political nature between white and colored persons, and I think these amendments taken in connection with the sections as they stood before amendment clearly show that such intention has been effectually accomplished so far as the Constitution is concerned.

We are fully conversant with the indisputable proposition that courts cannot dispense with a constitutional or statutory provision, merely because it appears that the policy upon which it was established or created has ceased or changed. (*Brown* v. *Clark*, 77 N. Y. 369.) When, however, that change in constitutional policy is proved by wholly incontestable and overwhelming evidence and, indeed, is nowhere challenged or denied, and where effect to such change has been

given in terms by amendments to more than one section of the Constitution, and where it appears that the provision in still another section, although not stricken out by an amendment in terms, is by the other amendments left without reason or excuse for its existence, it is not too much to hold that in such a case the alterations and amendments which have been actually made in the course of the attempt to effect the change of policy, do in effect and by implication strike out and abrogate a provision which, by reason of the amendments, has no longer any excuse for existence.

Another answer has been suggested to the general objection under discussion. It is that there can be no presumption that any particular proportion of colored persons not taxed lives in any one district and it cannot be presumed without proof that any one has therefore been injured by a failure to exclude such colored persons from the number of inhabitants upon which to base the senate districts. If the same proportion of colored persons not taxed to whites existed in all the districts, it is clear no one would suffer any harm from this failure to exclude such colored persons, and if no one would be harmed, it of course follows that no court would spend time in attempting to remedy errors which injured no one and which brought up nothing but abstract questions for adjudication.

No court should be called upon to presume any particular fact without the least legal evidence of its existence, for the purpose of thereby furnishing a reason for overthrowing an enactment of the legislature which must be presumed to have been enacted from good motives and for proper purposes.

Unless an unequal proportion of colored persons not taxed, to white persons, should be found or presumed to exist in the different districts, it cannot be said that any human being suffers harm. There is no evidence of the fact in these papers and its existence ought not to be presumed.

I think on both grounds herein set forth the answer to the claim of invalidity may well be placed.

So far in the discussion we have not alluded to any legal effect which the adoption of the amendments to the Federal

Constitution may have had upon the provisions of our State Constitution on the same subject. We do not decide the case upon any such ground and we intimate at present no opinion upon that subject.

For the reasons above given we are of the opinion that the objection to the validity of the act of 1892, based upon the failure to exclude persons of color not taxed, cannot prevail.

I have given these objections such an extended discussion not because I have felt the least doubt as to their proper decision, but because they have been so eagerly and zealously urged by counsel at the bar and because of the opinions of some of the learned judges in the courts below, which gave a force and validity to one or two of them, which it is impossible for us to allow, and, therefore, we feel called upon to give our reasons for our dissent at greater length than we should otherwise deem necessary.

There is another objection to this act which we will now consider.

Fourth. It is finally objected that the act is invalid because the senate districts do not contain an equal number of inhabitants as nearly as may be. These proceedings relate only to the assembly districts in Oneida and Monroe counties, but the inequalities in the senate districts in other portions of the state are cited for the purpose of showing a violation of the constitutional mandate in their formation and as a consequence the invalidity of the whole act, including the apportionment of members of assembly. This question of inequality contains in my judgment the only debatable proposition arising in these cases.

The act of 1892 when compared with the returns of the population as contained in the last enumeration, must be conceded (when a like comparison is made of the former acts with the enumerations which preceded them), to be the one which most nearly approaches fairness and equality, yet it is the only one which has been brought before the courts.

From the formation of government under written constitutions in this country the question of the basis of representa-

tion in the legislative branch of the government has been one
of the most important and most frequently debated. It is not
true that equality of numbers in representation has been the
leading idea at all times in regard to republican institutions.
Political divisions of the state have in New England been the
bodies which were entitled to representation, and the town as
a town and irrespective of the number of inhabitants has had
its representative in the legislature, so that a large town neces-
sarily had no more representation than a much smaller one.
This is the case to-day in some of the New England states.

The power to readjust the political divisions of a sovereignty
with the view of representation of those divisions or of the
inhabitants thereof, in the legislature, resides of course in the
first instance with the people, who in this country are the
source of all political power. The essential nature of the
power itself is not, however, altered by that fact. In its
nature it is political as distinguished from legislative or judi-
cial. In intrusting such power to any particular body, the
people could by their Constitution give written instructions
as to how it should be carried out, yet the essential nature of
the power still remains. If a portion of it be intrusted to
a body of men acting as a board for the mere purpose of mak-
ing a mathematical calculation and with instructions to dis-
charge its duties in a way which is solely mathematical, it is
clear that the board has no discretion whatever and it is bound
strictly by the terms of the grant of power. In such case the
people have not in reality parted with the whole power.
There may then be a power in the court to correct the very
slightest deviation from what can be clearly seen to be a mere
ministerial duty. There being no possibility for the exercise
of the slightest discretion, a violation of the arithmetical rule of
proportion would become a violation of the Constitution and
as such might be the subject of review by the courts. The
power to review would exist because of the fact that the
people had so bound and limited the exercise of the power to
readjust the political divisions of the state that the power
itself thus limited had become in its exercise by the body to

which it was intrusted, one of a ministerial nature only. Its nature as a political power in the board itself would in such case have been changed by the refusal of the people to permit of its exercise upon any other than a mathematical basis. Hence a direction to a body created by the people for such a purpose, which permitted no discretion in its exercise under any circumstances, might properly form the subject of enforcement by the courts. This, however, is not the case under our constitution. The power to alter these political divisions has been deposited by the people with the legislature and under such circumstances as to compel the exercise of legislative discretion in carrying out the power granted. The political nature of the power is thus retained. The learned judge who delivered the opinion at Special Term in the *Pond* case himself admits that some discretion is vested in the legislature and that in the nature of things it must be so left. He was of opinion that the discretion thus vested in the legislature had been overstepped and that the constitution had been thereby violated, and that the courts could review and reverse this action of the legislature. Discretion is necessarily reposed in the legislature because of the direction of the constitution that in making up the senate districts they must at all times consist of contiguous territory and that no county shall be divided in the formation 'of a senate district, except such county shall be equitably entitled to two or more senators. It is also provided that in apportioning members of assembly every county shall be entitled to one member.

This renders the mathematical process impossible, both as regards senate districts and the apportionment of members of assembly. We start then with the proposition that to the legislature is intrusted some discretion in the matter of apportionment. Is the court to interfere with such power whenever it thinks that the legislature might in its exercise possibly have come nearer to an equality, after complying with the special conditions mentioned in the Constitution? This would. be to assert a power in the court to supervise the use of the discretion granted to the legislature, if such discretion were:

exercised in the slightest degree after the constitutional man: date in regard to county lines and county members had been complied with. We do not believe in the propriety or neces- sity of any such rule. On the contrary, we think that the courts have no power in such case to review the exercise of a discretion intrusted to the legislature by the Constitution, unless it is plainly and grossly abused. The expression " as nearly as may be," when used in the Constitution with reference to this subject, does not mean as nearly as a mathematical process can be followed. It is a direction addressed to the legislature in the way of a general statement of the principles upon which the apportionment shall in good faith be made. The legislative purpose should be to make a district of an equal number of inhabitants as nearly as may be, and how far that may be carried out in actual practice must depend generally upon the integrity of the legislature. We do not intimate that in no case could the action of the legislature be reviewed by the courts. Cases may easily be imagined where the action of that body would be so gross a violation of the Constitution that it could be seen that it had been entirely lost sight of and an intentional disregard of its commands both in the letter and in the spirit had been indulged in.

In the report made to the senate of the United States in April, 1832, by a committee of that body of which Mr. Webster was chairman, it was stated that the words of the Federal Constitution were equivalent upon this subject to a direction to apportion the representatives among the states upon the basis of population, as nearly as may be. (3 Webster's Miscellaneous Works, 369.) It was then stated that the pro- cess theretofore adopted by congress was unconstitutional and that the true process was a mathematical one, which the report set forth. It was not then adopted by congress, which adhered to its old method. There is no intimation in the report that the action of congress, although what was termed unconstitutional, was subject to the revision of the courts. No such remedy was ever suggested. Congress has

since that time adopted the theory of the report and made a
mathematical problem of the subject and referred it to the
secretary of the interior to carry out its instructions on the
basis of arithmetic.

In this case mathematics cannot enter into the whole prob-
lem, because of the constitutional obligation as to county
lines and county representation, and hence the sole question
now is whether the legislative discretion has been so far
abused as to render the act liable to an overthrow by the
courts.   This brings us to an examination of the act itself.

It can be stated at the outset that although the fairest
that has been passed upon the subject the act is not an
ideal one.   There are some inequalities which any one indi-
vidual intrusted with the power might at once remedy, but
which might be very hard to alter when brought under the
review of 128 assemblymen and thirty-two senators.   Local
pride, commercial jealousies and rivalries, diverse interests
among the people, together with a difference of views as to
the true interests of the localities to be affected, all these
things and many others might have weight among the repre-
sentatives upon the question of apportionment, so that in
order to accomplish any result at all, compromise and concilia-
tion would have to be exercised.   Looking at the act as a
result of such circumstances, and it seems clear that it cannot
be said to be so far a violation of legislative discretion as to
cause its complete overthrow by the courts.

In regard to the senate districts some criticism has been
indulged in, both in the courts below and by counsel here, for
the purpose of showing they are inequitably made up.   So
far as regards the Oneida and Monroe districts there does not
seem to be much room for adverse criticism.   Those who
claim the act to be void cite other senate districts, which, when
compared together, are alleged to be unequal, and hence they
claim the constitutional obligation in regard to senate districts
has been disobeyed, and, therefore, the whole act is void.

It is proper to here remark that there are no figures in the
record in these proceedings from which it can be determined

what are the numbers of inhabitants in the different senate districts in the city of New York. Certain figures have been referred to by counsel, but they have been obtained, not from the record in these proceedings or from any public record, but from some source whose accuracy cannot be relied on, and which at all events is not in any manner before the court.

The real burden of complaint lies in the alleged violation of the Constitution in regard to the apportionment of assembly districts. So far as these parties litigant are concerned, it would seem that courts would not be specially astute to discover some inequality in senate districts which did not affect the propriety or equality of the representation in the senate districts of which they are inhabitants.

As to the senate districts, when it is considered that in their make up county lines must be adhered to, unless a county is equitably entitled to two senators, it is plain that great and necessary discretion is left to the legislature in their formation. The union of different counties in the state for the purpose of making up a senatorial district which must consist of contiguous territory, and in regard to which counties cannot be divided, necessarily results in inequalities which can in no possible way be avoided.

Certain districts may be picked out from the whole number and compared with certain others, and inequality be charged against them. But when all the counties in the state are to be arranged and brought into connection upon some plan in which the express commands of the Constitution as to contiguous territory and county lines are to be observed, it will pass the wit of man to make such an alteration of the senate districts for this state that may not be the subject of adverse criticism and of alleged possible improvement. We are of the opinion that the legislature, by the alteration of the senate districts under the act of 1892, has not violated the legitimate and necessary discretion intrusted to it by the Constitution.

As to the assembly districts the burden of complaint rests upon the apportionment of four or five members of assembly out of 128.

The learned counsel for the appellant in the case of the relator Carter makes up a list of the members of assembly as they have been apportioned and as he claims they should have been apportioned. In this list he shows that Albany is entitled to three, while four members are actually awarded. Dutchess is entitled to one, while two have been awarded. Kings is entitled to nineteen, while but eighteen have been awarded. New York is entitled to thirty-one, while but thirty have been awarded  Monroe is entitled to four, while but three are awarded. Queens and Rensselaer are entitled to but two each, while three each have been awarded them. This list shows that at least two counties (New York and Kings) have by the action of the legislature lost each one member while it is notorious that both were in accord with the dominant party in the legislature. It cannot be said that in regard to the others partisan considerations entered into the subject, because the counties to which the members were awarded are, when divided into districts, very uncertain as to the political complexion of their representatives in the assembly. By this act each county has been in fact awarded every member to which it was entitled by the ratio which obtained between population and representation. The only claim asserted or in fact existing is that in apportioning the remaining members after each county had been awarded its full number of members to which it was entitled upon the ratio adopted, the members thus remaining were in some few instances awarded to counties which had a less surplus over their ratio than some other counties, no county having enough to entitle it to another member upon the ratio existing.

In regard to these fractional parts of a ratio, an examination of the debates in the constitutional convention of 1846 shows that the subject of the representation of such fractions was discussed and efforts were made to provide in terms for a rule of representation for them, so as to limit the discretion of the legislature. (Debates on Constitution of 1846, page 366.) See also debates of constitutional convention of 1867 and the commission of 1872, where the subject was debated.

1892.]     People ex rel. Carter v. Rice.     **505**

Opinion of the Court, per Peckham, J.

The convention of 1846 finally framed the provision without any statement as to the fractions of ratios or how they should be treated, and the question was thus left to legislative discretion to be exercised in good faith, and not to be abused.

The reason for the particular action of the legislature upon this question must be sought for in some considerations other than partisan, for I think it is shown these did not enter into the question upon this point.

The inference is fair that these changes were absolutely necessary in order to secure the passage of the bill, having regard to the conditions under which legislative action is practicable. The Constitution is silent as to the ratios and some of the assailants of the act insist upon making up a new ratio, which shall require a larger number of inhabitants than the 1-128 part in order to entitle any county to a member, and they obtain this ratio by deducting the population of thirty counties, which must have one member each, from the total population of the state, and then dividing it by ninety-nine, the number of members remaining to be apportioned, which gives them a new ratio of 48,800, which is 3,559 in excess of the ratio based upon an absolute equality of apportionment. This operates unjustly against the counties entitled to the largest number of members, so that in the case of New York, entitled to at least 31 members, there is a loss of 31 times 3,559, or 110,329. And so correspondingly in the case of Kings. There is no arithmetical necessity in the adoption of this new ratio, if there be a sufficient number of members of assembly to be apportioned to give one to every 1-128 part of the entire population, with four to spare. By adopting the larger ratio, which the opponents of the act insist on, eleven members of assembly remain to be assigned to counties not having a full multiple of the ratio necessary to entitle them to an additional member. As to eight of these it is conceded that they are actually assigned to counties having the highest fractional excesses, but not so large as the other counties named if the assignment was made according to the plurality of excess. But it must be observed that by the adoption of this

new, arbitrary and unnecessary ratio, New York's representation would be reduced from 31 to 29, and Kings from 19 to 18, and that loss of three would fall to a portion of the state which, according to its population, has a much larger proportion of the business and wealth of the state.

Here were two ratios presented for adoption, each one of which had its defects, and the legislature certainly cannot be charged with any desire to be unfair or unjust if, in the distribution of the members of assembly after each county had received its full quota, according to the highest ratio, it took into account the large losses incurred by the populous counties if such ratio were adopted without modification.

It is also to be noted that the three members were assigned to counties, all of which have shown by the census increased population.

Other considerations might be added to show that the legislature of 1892, in the passage of the act under review, did not approach the danger line of an abuse of legislative discretion, but this opinion, which has grown to such large proportions, as well as the total lack of time, both warn me to desist from an attempt which is really unnecessary. It is proper at this stage to advert to the consequences which would or probably might follow the overturning of the act.

It is said, indeed, that courts have no right to look at the consequences which may follow their decision of legal questions. This is quite an erroneous statement of the principle. After a decision has been come to, it is true that courts have nothing to do with consequences. But in seeking for a correct solution of any legal question, especially the question of the proper construction of a statute or a constitution, the result which may follow from one construction or another is always a potent factor, and is sometimes in and of itself conclusive. In speaking upon the same subject in *Rumsey* v. *People* (19 N. Y. 52), the learned judge, in delivering the opinion of the court, said, upon a question of construction : " We have a right to consider the evil which would result from the prevalence of the alternative ;  *  *  *  should the

act be annulled and the new county (Schuyler) annihilated, the consequences would be disastrous." The learned judge then proceeds to state what they would be, and argues from them that another construction ought, if possible, to be given the act.

We are asked to say that in this act of 1892 the legislature has abused or overstepped the discretion devolved upon it by the Constitution. What is the result which would follow?

In the first place we should have every enumeration and every apportionment act brought before the courts for review, and as it would not be necessary to act immediately, any citizen at any time during the running of the decennial period would have the right to invoke the aid of the court to set aside as void any such act, and leave the people to suddenly confront such a situation as is now presented. This in itself is sufficient to induce a court to say that only in a case of plain and gross violation of the spirit and letter of the Constitution should such a power be exercised. Every county in the state but the two before us has acquiesced in the requirements of the act, apportioned its members among the towns and wards of the county or city, and done everything necessary to proceed to an election under its provisions. The greatest confusion and disorder would result from a holding that this act is invalid. Whether any members of assembly could actually be elected under any other law at this late day is quite problematical. The spectacle of a legislature elected under an unconstitutional law, or part of the members elected under it and part under another, is one which ought not to be contemplated without the greatest anxiety by all honest citizens.

When we come to the question of what law is in force in this state if the law of 1892 is not, the situation becomes most alarming. In the case of the relator Carter we are asked to command the secretary of state to issue notices for the election of members under the act of 1879. This act, if enforced now, would work still greater injustice than has ever been suggested against the act of 1892.

The same reasoning which would set aside as void the act of 1892 would be still more powerful and cogent as showing the total invalidity of the act of 1879. That act, when passed, was well known to be a most unjust and unequal one, particularly in regard to the interests of New York and Kings counties. Governor Robinson, in his memorandum filed with the act, which he refused to approve, shows beyond question its disregard of the constitutional mandate as to equality. The governor therein called particular attention to the matter, and said : " In the distribution of members of assembly the bill is still further from meeting the requirements of the Constitution. I find that Cattaraugus county, with 45,737 inhabitants, has two members, while Suffolk, with 50,330, is given but one. Orange, with 82,225 inhabitants, has but two members, while St. Lawrence, with only 78,014, gets three. Nor can I understand the philosophy which gives to the latter county, with 78,000 inhabitants, the same representation as Monroe, which exceeds it in population by nearly fifty thousand. These discrepancies are not to be explained. They admit of no apology or excuse. They are of the same class as that so-called necessity which entirely deprives 150,000 inhabitants in New York and Kings of their proper representation." So wrote Governor Robinson while refusing to veto the act, because as it stood it was better than the condition of things which it was to replace. Should this court now after thirteen years, and when the injustice and inequality have vastly increased, still order the secretary of state to issue election notices under such a law and should a legislature be elected under it ? It is said in answer that we need not decide upon the invalidity of the act of 1879, but leave it to the secretary of state what course to pursue and what law to regard, so long as he does not regard the act of 1892. This is as it seems to us a most absurd proposition and at the same time one fraught with the most alarming contingencies. To hold the act of 1892 void for this reason and yet to say nothing in regard to the law of 1879, which is far more obnoxious to the very arguments upon which we are asked to avoid the act of

1892, is to place the people of the whole state in a most improper and unfair position. The necessity of deciding is also founded upon the petition of the relator in the case against Rice, that he shall be ordered to give notices under the act of 1879. The question will arise at once, what act are we living under and what apportionment is the true one upon which to base election of members of assembly? The people are entitled to know what law they are living under, and where the apportionment is to be found which is legal and under which they could proceed to elect members if there were time enough left in which to put the machinery at work to accomplish that end. But there is not, in fact, time enough left for such purpose.

If the act of 1892 is void, the act of 1879 is also plainly void and no election of members of assembly should be tolerated under it. This might relegate the people to the act of 1866, and thus we might have an attempt at an election for members of assembly under an act more than a quarter of a century old and a legislative representation of the people of that time. This would be a travesty on the law and upon all ideas of equality, propriety and justice.

We are compelled to the conclusion that this act of 1892 successfully withstands all assaults upon it and is a valid and effective law.

Upon the argument our attention was called to certain cases decided in Michigan and Wisconsin, involving to some extent the questions decided herein.

In some of them the violation of the spirit of the Constitution was gross beyond cavil or argument. They would come within the description of an abuse of legislative discretion. In others the positive commands of the Constitution as to counties were plainly violated. The actual decisions might perhaps be upheld on the lines laid down in this opinion, but there are some things stated in some of the opinions which go beyond what this court is prepared to concur in.

The discretion necessarily vested in the legislature must be finally disposed of by it, unless, as we have said, there is such

an abuse of that discretion as to clearly show an open and intended violation of the letter and spirit of the Constitution.

The order in the first above entitled proceeding should be affirmed, with costs in all courts, and those in the second and third above entitled proceedings should be reversed and the motions for a mandamus granted, with costs in all courts.

GRAY, J.   I concur in holding the apportionment act to be valid.   The gravest objection which has been urged against its validity is that it has violated the constitutional require-ment as to equality of representation in the legislature.   I consider that the other points, which have been presented, have been sufficiently answered.   They do not seem to me to suggest reasonable grounds for assailing this legislative act. But if any provision of the fundamental law of the state, intended to secure the equal representation of its citizens in the legislative department, has been violated by the act in question, it is then, properly, the duty of the judicial depart-ment of power to declare it unconstitutional and, therefore, void.   The judiciary has a duty to pronounce all legislative acts null, which are contrary to the manifest tenor of the Con-stitution of the state.

Is that the case here?   If it is, it arises out of the appor-tionment of members of assembly.   I fail to see that in the arrangement of senate districts there exists any substantial ground for complaint.   As to members of assembly, the con-stitutional requirement is that the legislature shall apportion them among the counties "as nearly as may be according to the number of their respective inhabitants."   I think this language imports that some amount of discretion may be exercised by the legislature in perfecting an apportionment. For such an opinion I find support, both in the juxtaposition of the words and in the manner of their introduction into our Constitution.   If no discretionary power resided in the legislature to vary from a mathematical and methodical adjust-ment of members of assembly, according to the population of counties, the presence of the words "as nearly as may be"

is meaningless.   Their absence would better consist with the
sense contended for.   But they were brought in by an amend-
ment of our first Constitution, which was adopted in 1801.
Previously, the Constitution required that "the legislature do
adjust and apportion" the representatives in assembly to the
number of electors in the counties.   By the amendment in
1801, that provision was amended so as to require them to
apportion "as nearly as may be according to the number of
electors, etc."   In this change, or substitution, of language, I
deem an intention evidenced to confide something to the
judgment of the legislature, and, in view of many obvious
considerations, very wisely and justly so.

It was apparent that greater or less inequalities must arise
in an apportionment and that, after each county had received
its full number of assemblymen, according to the ratio of
apportionment established, there would remain some members
to be distributed among those counties having excesses of
population over the ratio.   The contention of counsel is that
that distribution must be in the order of the highest excesses,
or remainders over, and any discretion in the matter is
denied.   In the present case, for instance, there were eleven
members of assembly to be so distributed among counties
having fractional excesses, and the showing is that three were
apportioned out of the strict order in which those excesses
stood.   It may be remarked, in passing, that in an apportion-
ment of one hundred and twenty-eight members among the
counties, this showing evidences no glaring departure from
strict equality, nor any scheme to defraud the people in the
matter of representation.   It is the general rule of law that
the courts have no concern with the motives of the legislative
body in passing an act.   If they find the power conferred to
so enact, they may not intervene to prevent the execution;
and at all times they should be slow to interfere with the legis-
lative department of power.   If there were here a flagrant
disregard and an unmistakable violation of the constitutional
injunction that the apportionment should be "as nearly as
may be" according to the number of citizens, the courts

might feel justified in declaring the act void for unconstitutionality. But we have no reason to impute any fraudulent motives, and the showing of three instances of departure from a methodical apportionment is not enough to evidence any deliberate violation of the constitutional requirement. The legal presumption is in favor of the constitutionality of every act of the legislature, and that presumption is not overcome in this instance, where the legislative act simply evidences the exercise of discretion in performing a political duty. We may concede that adherence to a simply mathematical system of distribution of members among the counties, in the order of their excesses of population over the ratio, is the better rule; but deviations may be demanded by public exigencies. Some consideration must be had of the difficulties which environ the passage of an act of apportionment, in the conflicting claims and demands of representatives; some latitude of action must be permitted in considerations which pertain to the geographical situation and necessities of counties, and some allowance must be made for active opposition engendered by political feeling. As the bill was reported, an exact and mathematical apportionment appeared, but to secure the passage of the act some changes were made by the legislature. I do not think that the legislature is to act as a mechanical contrivance for the mathematical distribution of members of assembly. The Constitution does not say so in unmistakable terms, and, if it does not, courts should hesitate to assert it. Something is confided to the wisdom and judgment of the legislative body in performing this constitutional duty, and if in the execution of the duty the result is not perfect, the courts should presume that the legislature endeavored to accomplish it as nearly as might be. I think, according to a logical and candid view of the constitutional requirement, it might be impracticable, unless there was some discretion vested in the legislature with respect to carrying it into effect. There has been no abuse of this discretion, and for us to adjudge the act unconstitutional and to declare it void, would be, in my judgment, a most unwise construction, and would be to arro--

gate a power of interference, as dangerous in the precedent as it seems unwarranted in the law.

ANDREWS, J. (dissenting). I am of opinion that the Apportionment Act of 1892 is void for the reason that in apportioning members of assembly among the counties of the state, it violates the rule of equality prescribed by the Constitution. It is the cardinal principle of free representative government that every elector shall have equal weight in exercising the suffrage. Proportionate representation according to population is the rule both in the Federal and State Constitutions, except where, by reason of constitutional arrangements and compromises, its full application has been departed from. The rule can never be disregarded consistently with our representative system, except under the express sanction of the people, given in the Constitution, or necessarily implied from its provisions. This is a constitutional principle so fundamental and so well recognized that the citation of authorities in its support is unnecessary.

The Constitution of New York, in prescribing the manner of constituting the legislature, has adhered to the principle of representation according to citizen population, except so far as it was necessarily modified to accomplish another purpose also deemed of great importance, viz., that the autonomy of the counties should be preserved in the formation of senate districts, and that each county should be entitled to at least one member of assembly. The Constitution (Art. 3, § 4) prescribes that counties shall not be divided in the formation of senate districts, except where a county shall be equitably entitled to more than one senator, and (Art. 3, § 5) that each county, except the county of Hamilton, shall be entitled to one member of assembly, and that when a county is entitled to more than one member, it shall be divided into districts; but that no town shall be divided in the formation of assembly districts. This scheme of creating territorial districts for the election of senators and members of assembly necessarily results in some inequality. But except as modified by these

provisions, the Constitution carefully preserves the principle of representation according to population. It enjoins upon the legislature to so constitute the senate districts "that each senate district shall contain, as nearly as may be, an equal number of inhabitants, excluding aliens and persons of color not taxed" (Art. 3, § 4), and it commands that "the members of assembly shall be apportioned among the several counties of the state" by the legislature, as nearly as may be, according to the number of the respective inhabitants, excluding aliens." (Art. 3, § 5.)

The intention of the people to preserve and guard, by the Constitution, the principle that every voter is to have equal weight and voice in the selection of representatives, subject only to the modification before referred to, is unmistakably indicated in other parts of the legislative article. The provisions prescribing decennial enumerations of the inhabitants of the state, and a decennial arrangement of senatorial and assembly districts, were inserted to accomplish this object. The supreme purpose of these provisions was to secure at short recurring periods a readjustment of the inequalities, which might arise from the growth or shifting of population during the decennial period. Further, to prevent such inequality and to secure the practical operation of the fundamental principle of equal suffrage, the Constitution in the provision quoted, enjoined upon the legislature that the senate districts should be organized, and the members of assembly should be apportioned, as "nearly as may be," according to the number of inhabitants.

By what process the legislature reached the results embodied in the apportionment act does not distinctly appear. It had before it the enumeration of the representative population in each of the counties of the state. The problem (in respect to the assembly) was to apportion among the several counties the 128 members of assembly, "as near as may be," according to the number of the respective inhabitants, excluding aliens. It seems to have first assigned to twenty-nine counties (reckoning Fulton and Hamilton as one), each having less than a

full ratio of population necessary to constitute an assembly district, one member each, leaving ninety-nine of the 128 members unassigned. It then assigned to each of the other counties a member or members, corresponding with the number to which it was shown to be entitled, as ascertained, by dividing the whole population of the county by the ratio. This left remainders in all the counties and eleven of the 128 members unassigned. The eleven counties having the largest remainders were : Orange, 44,474; Onondaga, 44,460; Kings, 39,400; Ulster, 39,593; Monroe, 34,833; Steuben, 32,600; St. Lawrence, 31,800; Westchester, 31,226; Queens, 26,376; Dutchess, 26,272; Chautauqua, 25,085.

If in apportioning the eleven unassigned members the apportionment had been made upon the principle of assigning them to the counties having the highest remainders, one would have been assigned to each of the counties above named in their order. The legislature did assign an additional member to each of the first four counties named, and when it came to Monroe, skipped and gave no additional member to that county, but did instead award one to Steuben. It refused to give an additional one to St. Lawrence, but gave one to the succeeding county, Westchester. It gave one to Queens and one to Dutchess, but gave none to Chautauqua. In preference to Monroe, St. Lawrence and Chautauqua, it gave an additional member to Albany, having a much smaller remainder than the others. It gave one to New York county, which had a remainder of 8,813, and one to Rensselaer, having a remainder of 24,081. Neither Albany, New York county or Rensselaer had a remainder equal to any of the eleven counties named, and in some of the cases the disproportion was very great. The inequality in the distribution of political power under this apportionment is illustrated by another form of statement contained in the opinion of Judge Dwight. Dutchess county, with a population less than St. Lawrence, receives double the representation of the latter; Albany county, with less than twice the population of St. Lawrence, receives four times its representation, and Monroe county, with

24,000 more population than Albany, receives one less representative.

The question is, was this apportionment of members to counties having smaller remainders of representative population than other counties, and giving the former additional representation denied to the latter, a compliance with the command of the Constitution that the apportionment should be made "as nearly as may be" according to the number of inhabitants of the respective counties. I think the question admits of but one answer, and that it is incontestable in reason, that the constitutional rule required that the eleven members should have been assigned to the counties having the highest remainders. This would have been the nearest approximation to equality, according to population. That this is so is a mathematical certainty, and admits of no controversy.

A question identical in principle was considered by Mr. Webster in a report made to the United States senate in 1832, by a committee of that body, of which Mr. Webster was chairman, relating to the rule which ought to prevail in the apportionment of members of congress among the states. The Federal Constitution provides (Art. 1, § 3) that "Representatives and direct taxes shall be apportioned among the several states according to their respective numbers," etc. The question considered by the committee was as to the constitutional method of apportioning unassigned representatives as between states having fractions of population less than a full ratio. The committee were unanimously of the opinion that the loss of members arising from the residuary numbers should be made up by assigning as many additional members as are necessary for that purpose to the states having the largest fractional remainders, and this was the rule subsequently adopted by congress. (Webster's Works, vol. 3, p. 368.) It will be observed that the words "as near as may be" are not in the provision of the Federal Constitution, but it was the opinion of the committee that the meaning was the same as if these words had been inserted. Mr. Webster said: "The Constitution, therefore, must be understood, not as

enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring congress to make an apportionment of representatives among the several states according to their respective numbers, *as near as may be.* That which cannot be done perfectly must be done in a manner as near perfection as can be. If exactness cannot, from the nature of things, be attained, then the nearest practicable approach to exactness ought to be made. Congress is not absolved from all rule merely because the rule of perfect justice cannot be applied. In such a case approximation becomes a rule; it takes the place of the other rule, which would be preferable, but which is found inapplicable, and becomes itself an obligation of binding force. The nearest approximation to exact truth or exact right, when that exact truth or exact right cannot be reached, prevails in other cases, not as matter of discretion, but as an intelligible and definite rule dictated by justice and conforming to the common sense of mankind; a rule of no less binding force in cases to which it is applicable, and no more to be departed from than any other rule or obligation." Again (p. 379), "The Constitution, as the committee understood it, says, representatives shall be apportioned among the states according to their respective numbers as near as may be. The rule adopted by the committee says, out of the whole number of the house, that number shall be apportioned to each state which comes nearest to its exact right according to its number of people." No one can fail to perceive the analogy between the question discussed in this report to that which is involved in the apportionment now under consideration.

The argument urged upon us that the words " as nearly as may be " give a discretion to the legislature, if it means anything, as applied to the circumstances of this case, means that the legislature may disregard the plain meaning and mandate of the Constitution. I deny that the rule that apportionment must be " as nearly as may be " according to population, is, or under any circumstances can be discretionary. I can conceive that an apportionment act should not be held to be unconstitutional for

every trivial departure from the rule of equality. Some mistakes will inevitably be made in the enumeration in the first instance, and afterwards by the legislature in making the apportionment, although it may act under the most sincere desire to apply the rule of the Constitution. But because the apportionment cannot be exact according to population, and some inequality is unavoidable, this does not absolve the legislature from applying the rule in every case, and it cannot, under the cover of the words "as nearly as may be," disregard the rule and relegate the proceeding to the domain of discretionary powers and escape its binding obligation. When the court can see that the rule of the Constitution was not in fact applied and the circumstances for its application were clear and unequivocal, then there is nothing left to the court but to declare the apportionment void. The suggestion that the circumstances under which legislatures act in such matters give opportunity for the play of passion and prejudice, and therefore this must be considered in determining the validity of an apportionment act, seems to me to have no place in this discussion. The very object of constitutional restrictions is to establish a rule of conduct which cannot be varied according to the passion or caprice of a majority, and to fix an immutable standard applicable under all circumstances. If a departure from the fundamental law by legislatures can in one case be justified by the frailties of human nature, and the constitutionality of an act may be made to depend in one case upon such a consideration, the constitutionality of all legislation may be govorned by the same rule. I have said the very object in imposing restraints in the Constitution is to protect great principles and interests against the operation of such eccentric and disturbing forces. The discretion of the legislature, if any, in apportioning members, ends where certainty begins, and that point was reached when the counties having the largest remainders were ascertained. The attempt to justify the apportionment of 1892 by the fact asserted (which seems to be true), that the apportionment of 1879 was subject to as great or greater objection on the score of inequality than

the later act, fails because the fact is irrelevant. It is one thing that a legislature has disregarded its duty on a former occasion and that the people have acquiesced in the usurpation, and quite a different and much more serious thing if such a disregard of constitutional limitation should receive judicial sanction.

Reference was made on the argument to the senate districts constituted by the Constitution of 1846, and by the convention which framed that instrument. The tables presented by the attorney-general show that the ratio for a district was about 81,000, and the greatest variations were in New York, which with four senators had a surplus of about 48,000, a little more than half enough for another senator, and in the thirtieth district, which consisted of the counties of Allegany and Wyoming, in which there was a deficiency of about 28,000. These were the two extremes. The problem to be solved had three inflexible elements preventing equality and compelling instead, approximation. The convention found in existence a senate of thirty-two members elected in eight districts or four from each. Those districts were to be changed from eight to thirty-two, each electing a single senator. That was the first condition. The next was that no county should be divided unless it was entitled to two or more senators; and the third that the districts should be composed of contiguous territory. The debates show that it was quite generally conceded that a nearer approach to equality could only be reached by enlarging the number of the districts, which the convention was unwilling to do; and no different and better apportionment consistent with the conditions was formulated by anybody, or shown to be reasonably possible. It was the opinion of the members of the convention, as shown by the debates, that no nearer approach to the equality for which they struggled could be reasonably attained. To cite a necessary inequality as a precedent for an unnecessary one, a discrepancy compelled by inexorable conditions for one which there was perfect freedom to avoid, the compulsion of an inherent difficulty for a wrong both voluntary and need-

less, constitutes no answer to the inequalities in the assembly apportionment. If in 1846 there had been one additional senator to be allotted to some one district and such allotment had been denied to the first district with a surplus of 48,000, and given to the thirteenth, with a surplus of about 1,000, it would have been a precedent for what was done in the case at bar. The convention in projecting the new scheme was treading on unfamiliar ground, but it did not leave in doubt the rule by which future legislatures should be governed.

The departure from the constitutional method in the act of 1892, is substantial, and its validity having been challenged in the courts, it cannot be upheld without establishing a dangerous precedent for the future. The claim that the legislature in making an apportionment may take into consideration the probable unequal growth of populations, has no support in the Constitution. The apportionment is to be based on existing populations, as ascertained by the preceding enumeration. The decennial enumeration and apportionment is the constitutional remedy for any such temporary inequalities. If the legislature was permitted to act upon the ground suggested, it would introduce a most uncertain element and might be made the cover for great abuses. It is plain that in the present case the inequalities are not attributable to any such consideration. Monroe county, containing a rapidly growing city, and with a much larger population than Albany county, was given three members, and Albany was given four. It is unnecessary to consider in this case the question of the constitutionality of the act of 1892, so far as it relates to senate districts. The inequalities in some instances are very great and seem to have been unnecessary. For example, one of the districts in the city of New York has a population of 241,138 while another district in the same city has a population of 105,720, and they are not bounded by ward or election district lines. But having reached the conclusion that the apportionment act in the apportionment of members of assembly violates the Constitution, the question as to the senate districts is unimportant in the decision of this case. The act must stand

or fall as a whole, and if in respect to one branch of the legis-
lature the act is unconstitutional, it cannot be upheld as to the
other.

I shall not undertake to show that the question presented
is of judicial cognizance.    That it is a judicial question cannot,
under the authorities, be denied.    The legislature and the
courts are alike bound to obey the Constitution, and if the
legislature transgresses the fundamental law and oversteps in
legislation the barriers of the Constitution, it is a part of the
liberties of the people that the judicial department shall have
and exercise the power of protecting the Constitution itself
against infringement.    The power of the courts to set aside
an unconstitutional apportionment has quite recently been
asserted and exercised by the courts of Wisconsin and Michi-
gan.    (*State* v. *Cunningham,* N. W. Rep. vol. 51, 1133;
*Giddings* v. *Blacker*, Id. vol. 52, 944; *Supervisors of
Houghton Co.* v. *Blacker, Secy. of State,* Id. 951.)    These
cases consider with much ability the question of judicial power,
and determine that a substantial departure in an apportionment
act from the rule of equality, renders it void.

I recognize the gravity of the question now presented.
Nor do I fail to appreciate that holding the apportionment
act void will produce temporary inconvenience, but the evils
which may flow from this are not to be compared, I think,
with the public injury which will result from sanctioning a
disregard of one of the vital principles of representative
government.

EARL, Ch. J., O'BRIEN and MAYNARD, JJ., concur with
PECKHAM and GRAY, JJ.    ANDREWS and FINCH, JJ., dissent-
ing upon point discussed in opinion of ANDREWS, J., but con-
curring with PECKHAM, J., on all other points.

Ordered as directed in opinion of PECKHAM, J.