Matter of Miller v State of New York
2026 NY Slip Op 03907
June 18, 2026
Court of Appeals
Per Curiam
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

In the Matter of Robert J. Miller, et al., Appellants,
v
State of New York et al., Respondents.

Decided on June 18, 2026
No. 64

John Leventhal, for appellants.
Ester Murdukhayeva, for respondent State of New York.
If/When/How: Lawyering for Reproductive Justice et al., Marcy Syms Equality Initiative at NYU School of Law's Birnbaum Women's Leadership Center, The Legal Aid Society,
New York Civil Liberties Union, amici curiae.

Per Curiam
[*1]
Members of the judiciary in New York State have been subject to a mandatory retirement age since the adoption of our first State Constitution in 1777. In the current Constitution, article VI, § 25 (b) mandates retirement at 70 years old, with an opportunity
for certain judges and justices to serve until age 76. Petitioners, former and sitting justices of the New York State Courts, contend that this provision was implicitly repealed by the Equal Rights Amendment ("ERA") of 2024, which amended article I, § 11 to add, inter alia, age to the classes protected from discrimination in the exercise of civil rights. Petitioners argue that as a result of this alleged implicit repeal, Judiciary Law §§ 23 and 115, which together implement the constitutional mandatory retirement age cap and certification system set forth in article VI, § 25 (b), are now unconstitutional. However, we have long held that implied repeal is disfavored (see People ex rel. Carter, 135 NY 473, 496 [1892]; see also Alweis v Evans, 69 NY2d 199, 204 [1987]). The text, purpose, and history of these constitutional provisions establish that they operate independently: article VI, § 25 (b)'s retirement mandate addresses a different constitutional matter than the ERA, and the two provisions are not antagonistic and may be harmonized. Therefore, we affirm the Appellate Division order affirming dismissal of the underlying petition.
I.
The Relevant State Constitutional Provisions
This appeal concerns the interplay between two state constitutional provisions: article VI, § 25 (b)—the mandatory judicial retirement and certification provision—and article I, § 11—the Equal Protection and Civil Rights Clauses—as amended by the ERA. The parties and amici dispute the proper interpretation of these provisions, but we need not address all their myriad arguments because we are able to dispose of this appeal by holding that the two provisions do not conflict.
[*2]A.
Article VI, Section 25 (b) Mandates Judicial Retirement
The New York State Constitution provides for the election or appointment of judges and justices for a set term (see NY Const, art VI, §§ 2, 4, 6, 9, 10, 12, 13, 15, 16). For over two centuries, from its adoption in 1777, the Constitution has imposed a mandatory retirement age for judges (see NY Const § XXIV [1777]). Initially, that age was set at 60 and then increased to 70 by amendment in 1869 (see NY Const, art VI, § 13 [1869]). In 1961, the Constitution was further amended to permit administrative certification for certain former judges and justices who reached 70 years of age to serve up to age 76 (see NY Const, art VI, § 25 [1961]).FN1 The text of the retirement and certification requirements has remained unchanged since then.
The provision states in relevant part,
"Each judge of the court of appeals, justice of the supreme court, judge of the court of claims, judge of the county court, judge of the surrogate's court, judge of the family court, judge of a court for the city of New York . . . and judge of the district court shall retire on the last day of December in the year in which [they] reach[ ] the age of seventy. Each such former judge of the court of appeals and justice of the supreme court may thereafter perform the duties of a justice of the supreme court . . . [if] certificated in the manner provided by law that the services of such judge or justice are necessary to expedite the business of the court and that [they are] mentally and physically able and competent to perform the full duties of such office. Any such certification shall be valid for a term of two years and may be extended as provided by law for additional terms of two years. A retired judge or justice shall serve no longer than until the last day of December in the year in which [they] reach[ ] the age of seventy-six . . . ." (NY Const, art VI, § 25 [b]).
This provision reflects the will of New York's voters that judges and justices shall retire upon reaching a specified age. The voters have reaffirmed that constitutional design—last amended in 1961—that judges and justices shall not serve past the age of 70; in 2013, the voters rejected, by a wide margin, a proposed constitutional amendment to raise the retirement age for certain judges and justices to age 80 (see Proposed Constitutional Amendment, Historical Notes, McKinney's Cons Laws of NY, NY Const Art VI, § 25; 2013 NY Senate Bill S886A, 2013 NY Assembly Bill A4395). Significantly, no ballot measure has ever sought to eliminate the age requirement.
B.
Article I, Section 11
As initially approved by the voters in 1938, article I, § 11 provided,
"No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in [their] civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state" (former NY Const, art I, § 11).
The Equal Protection Clause in the first sentence requires that the State and its subdivisions treat all persons equally under the law (see People v Kern, 75 NY2d 638, 650-51 [1990]). The second sentence sets forth the Civil Rights Clause, which prohibits discrimination by state and private actors as to civil rights (id. at 651).
As amended by the voters in 2024, article I, § 11 of the State Constitution now states:
"a. No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, ethnicity, national origin, age, disability, creed, religion, or sex, including sexual orientation, gender identity, gender expression, pregnancy, pregnancy outcomes, and reproductive health care and autonomy, be subjected to any discrimination in their civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state, pursuant to law.
b. Nothing in this section shall invalidate or prevent the adoption of any law, regulation, program, or practice that is designed to prevent or dismantle discrimination on the basis of a characteristic listed in this section, nor shall any characteristic listed in this section be interpreted to interfere with, limit, or deny the civil rights of any person based upon any other characteristic identified in this section" (emphasis added).
According to the Senate and Assembly sponsors, the ERA was intended "to ensure that [the] State Constitution extends to all New Yorkers, particularly those who have faced severe and pervasive injustice, the right to be free from discrimination" (Assembly Mem in Support of 2023 NY Assembly Bill A1283 [Assembly Mem]; Senate Mem in Support of 2023 NY Senate Bill S108A [Senate Mem] [same]). The ERA was designed to achieve this aim "by expanding the list of classes affirmatively protected by the New York Constitution in recognition of the need for comprehensive, enforceable, and intersectional equality under the law" and "guarantee[ing] the validity of efforts to prevent or dismantle structural forms of inequality or discrimination against protected classes" (Assembly Mem; Senate Mem [same]). The Legislature noted that the ERA was necessary because article I, § 11 "was last amended to address this topic in 1938 . . . , prior to the civil rights movement, the movement for gender justice, the LGBTQ movement, the disability rights movement, and the many developments in anti-discrimination law," and that "New York's Constitution must reflect our broad conception of justice, equal rights and the duty to protect all people in the state against discrimination" (Assembly Mem; Senate Mem [same]).
II.
Procedural History
Petitioners are, respectively, a retired Appellate Division Justice who reached the maximum constitutional certification age of 76 at the end of December 2025, and two currently certified Supreme Court Justices. Petitioners filed this hybrid article 78 and declaratory judgment proceeding against the State and the Office of Court Administration (OCA),FN2 challenging article VI, § 25 (b), and its legislative codification in Judiciary Law §§ 23 and 115.FN3 Supreme Court [*3]denied petitioners' request for preliminary relief, granted the State's cross-motion, and dismissed the petition.
The Appellate Division affirmed, concluding that article I, § 11, as amended by the ERA, did not implicitly repeal article VI, § 25 (b)'s pre-existing mandatory age requirement (247 AD3d 502 [1st Dept 2026]). In reaching that holding, the Court considered that "the ERA contains no reference to article VI, the eligibility of persons to serve as judges or justices, or the judicial retirement age" (id. at 503). That Court rejected petitioners' assertion that the principle that a "subsequent general statute will repeal a prior special law" applies here, noting that "the ERA addresses a different subject matter from the provision petitioners seek to have declared nullified" and that "petitioners cannot show that the [L]egislature or the voters intended for the ERA to repeal article VI, § 25 (b)" (id.). After holding that petitioners' "cause of action asserting an implicit repeal necessarily fails," the Court concluded that "[i]t follows that petitioners cannot demonstrate . . . that Judiciary Law §§ 23 and 115, which implement article VI, § 25 (b) faithfully, are unconstitutional" (id. at 504). The Appellate Division "decline[d] to reach the issues of whether the ERA made the Civil Rights Clause of article I, § 11 self-executing, or whether strict scrutiny applies to age-based statutory classifications, as these issues are academic in light of our determination" (id.).FN4 Petitioners now appeal to our Court as of right pursuant to CPLR 5601 (b) (1)].FN5
III.
Constitutional Repeal
We proceed from first principles. "[A]n amended Constitution must be read as a whole and as if every part had been adopted at the same time and as one law, and effect must be given to every part of it, each clause explained and qualified by every other part" (People ex rel. Killeen v Angle, 109 NY 564, 575 [1888] [internal quotation marks and citation omitted]). Thus, every attempt should be made to harmonize the State Constitution's various sections (see id.; People ex rel. McClelland v Roberts, 148 NY 360, 367 [1896]; Matter of Smith v Board of Supervisors of St. Lawrence [*4]County, 148 NY 187, 193 [1896]; People ex rel. Balcom v Mosher, 163 NY 32, 36 [1900]; McMahon v Michaelian, 38 AD2d 60, 62 [2d Dept 1971], affd 30 NY2d 507 [1972]). Generally, an amendment to the State Constitution repeals only the particular provision actually changed, as "the very purpose and effect of an amendment is to amend the relevant portion of the Constitution, effectively repealing and voiding any prior version of the particular section so amended" (Matter of Baldwin Union Free Sch. Dist. v County of Nassau, 22 NY3d 606, 625 [2014] [citations omitted]). That said, "[a] constitutional provision can [also] be implicitly abrogated by the adoption of another and later one which is antagonistic to it, although the original provision may in terms remain unaltered" (Carter, 135 NY at 496). Significantly, however, "[a] repeal by implication is not favored . . . in regard to any provision of our organic law" (id. at 496; see also Alweis, 69 NY2d at 204 [implicit repeal is "distinctly not favored in the law"]). Even where two constitutional provisions are in tension, a new amendment will not implicitly repeal a preexisting provision unless "the fact of its opposition to [the] former provision and the intent to displace it by the amendment adopted, [is] so plainly shown by the provisions themselves that there can be no rational doubt in regard to it" (People ex rel. Carter, 135 NY at 496-497). Moreover, a more general provision "will not repeal a more specific one" unless it can be "clearly shown" that such result was intended (Cimo v State, 306 NY 143, 149 [1953]; see also People v Mobil Oil Corp., 48 NY2d 192, 200 [1979] [collecting authorities]). The question is fundamentally one of the voters' intention, for only "[t]he power that made can unmake" (People ex rel. Carter, 135 NY at 496).
The ERA does not expressly repeal article VI, § 25 (b). Importantly, the ERA makes no mention of article VI, § 25 (b). Indeed, the ERA amends a different provision of the Constitution, article I, § 11, which was drafted to address wholly different, broader concerns. The plain texts of these two provisions provide no support for express repeal (Matter of Baldwin Union Free Sch. Dist., 22 NY3d at 623-625).
Lacking textual support for an express repeal argument, petitioners contend that the ERA implicitly repealed article VI, § 25 (b) because the ERA prohibits all discrimination—including employment discrimination—based on age. Thus, the argument goes, the two constitutional provisions irreconcilably conflict. Furthermore, petitioners maintain that article VI, § 25 (b)'s judicial retirement and certification requirements must give way to the more recently enacted ERA's broad anti-discrimination mandate. The arguments are unpersuasive.
Petitioners' first line of argument runs afoul of our rule disfavoring implied repeal. Article VI, § 25 (b) and article I, § 11 are not "in such conflict that it is impossible to give some effect to both" (Alweis, 69 NY2d at 204; People ex rel. Carter, 135 NY at 496). At the time of the ERA's enactment, article VI, § 25 (b) explicitly set a 70-year-old retirement age for judges and justices with the possibility of serving until they reached 76 (NY Const, art I, § 11 [a]; NY Const, art VI, § 25 [b]). The State Constitution has always limited the scope of judicial service in this way, reflecting the intent of the voters for over two hundred years to impose this restriction on judicial tenure. Judges and justices are elected and appointed to set terms with the understanding the voters have expressed their desire in the strongest terms—by constitutional proscription—that judicial service ends when a judge reaches the age chosen by the voters, as set forth in article VI, § 25 (b), regardless of whether more time remains on the judge's term.
Petitioners nevertheless maintain that because the ERA prohibits all age discrimination it thus must repeal the judicial retirement mandate. There is no evidence that the Legislature and the voters would have sought to accomplish such a dramatic change to the mandatory retirement provision merely by inference, and we see no indication that they intended to do so by adopting the ERA. Given the longstanding constitutional age limitation on judicial service, the most natural and direct way to change course after two hundred years would be to amend outright article VI, § 25 (b). Or, we would expect that if the ERA were intended to eliminate the age limitation, the ERA would unambiguously declare its repeal of article VI, § 25 (b). Instead, according to petitioners, we are to presume that the drafters and the voters obfuscated their intent to eliminate the specific, longstanding age limitation found in our State Constitution by merely including "age" within the ERA's list of protected classifications. We assume that the drafters were aware of the established interpretive principle that repeal by implication is disfavored and that only a clear statement of repeal eliminates any doubt as to the voters' intent. Indeed, repeals of constitutional provisions historically have been accomplished through explicit language, language that is missing from the ERA and article VI, § 25 (see e.g. NY Const, [*5]art I, §§ 7 [b], [e], 10, 13, 15; NY Const, art V, § 5; NY Const, art VI, § 36-a).
Petitioners' other argument that the ERA repeals article VI, § 25 (b) because it is the most recent articulation of the will of the voters fares no better. This argument ignores the basic canon of construction that specific provisions control over general provisions unless the opposite intent is "clearly shown" (Cimo, 306 NY at 149). Article I, § 11 addresses rights generally, and is not limited to judges or judicial service; it mandates equal treatment of all persons by state actors and prohibits public and private discrimination based on a list of protected classifications. In contrast, article VI, § 25 (b) provides specific age-related employment eligibility requirements for a discrete group of judges and justices. This specific provision thus controls over article I, § 11, as amended by the ERA, which sets forth a broad equality provision applicable to all New Yorkers (id.).
The legislative history supports our conclusion that the ERA does not and was never intended to repeal article VI, § 25 (b). There is no reference in that history to any implicit repeal. In fact, an opinion letter from the Attorney General stated that "if adopted, the proposed amendment will have no effect upon other provisions of the Constitution" (Letter from Attorney General, July 6, 2022, RE: Senate No. 51002 [emphasis added]). Nothing else in the legislative history contradicts that statement, and, thus, we assume that the drafters proceeded with the understanding that the ERA did not affect constitutional provisions beyond article I, § 11. If that were not convincing enough, legislative efforts following enactment of the ERA provide further support for our conclusion that the ERA did not implicitly repeal the judicial retirement mandate. In 2025, less than three months after the voters approved the ERA, legislation was proposed amending article VI, § 25 (b) to increase the retirement age to 76 (see 2025 NY Assembly Bills A3756, A3757; 2025 NY Senate Bill S7455). Certainly there would be no reason for further amendment—especially so soon after the ERA vote—if the ERA repealed the judicial retirement mandate. Moreover, if petitioners were correct that the ERA prohibits all age discrimination, then the proposed 2025 amendment—which modified but did not eliminate the retirement mandate—would itself violate the ERA's prohibition on age discrimination. Petitioners' interpretation is thus contrary to our constitutional text and design, doctrines of constitutional interpretation, and the actions of the drafters and the voters. What the voters made in 1777, as reaffirmed in 1869 and 1961 in article VI, § 25 (b), was not unmade in 2025 in the ERA (People ex rel. Carter, 135 NY at 496).
IV.
Conclusion
The voters have spoken clearly since 1777 that judges may serve until they reach the constitutional age of retirement. That age limit has never been eliminated. For more than two centuries, the voters only modified the age limit, first during the Reconstruction era by raising the age to 70, and again in 1961, when the voters approved a certification process for certain judges and justices to serve to age 76. That limit has been fixed since then, with no ballot initiative to eliminate it and a failed effort in 2013 to raise the age to 80. The retirement age is part of New York's constitutional design. The State's voters, Legislature, members of the bench, and judicial candidates have understood that judicial service is limited in this specific way. Article I, § 11, as amended by the ERA, did not repeal article VI, § 25 (b). The retirement mandate stands.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Troutman, J. (concurring):

Although I concur with the outcome reached by the majority, I do so recognizing that New York's recently enacted Equal Rights Amendment (ERA) created enforceable rights with which we must contend. This case has broad implications for our State's constitutional jurisprudence in the wake of New Yorkers' historic passage of the ERA. That was a monumental achievement, which created new constitutional rights that were previously not in existence. The majority does the ERA disservice by not pronouncing the enforceability of those rights and by concluding blithely that the ERA's protection of age as a suspect classification does not conflict with a previously existing provision in our Constitution mandating that certain judges and justices retire at age 70. Consequently, I write this concurrence to address gaps in the majority's reasoning and to address how the majority's per curiam opinion may adversely impact the [*6]protections contained in the ERA, which were voted into existence by the citizens of this State.
I.
When New York's Constitution was initially enacted in 1777, it contained a provision mandating judicial retirement at age 60, which was increased to age 70 in 1869. As one delegate opined,
"[T]he judicial office should be established on the principle of good behavior, 'during what may be expected to be the period of judicial usefulness in respect to age and faculties. By fixing the age at seventy years as the period of judicial life, we avoid some of the difficulties which have been felt, and others which have been imagined, as resulting from the prolongation of the term of office beyond the powers of mind and body necessary for the performance of its duties. Establishing that as the term of judicial life, we then give to the incumbent the security, and to the public the advantage of the continuance in office of a judge during that period" (2 Charles Z. Lincoln, The Constitutional History of New York at 252-253 [1906]).
Around the time the Constitution was amended in 1869, the average life expectancy was estimated to be only around 41 years of age for men and 43 years of age for women (see Haines and Roger C. Avery, The American Life Table of 1830-1860: An Evaluation, The Journal of Interdisciplinary History, Vol. 11, No. 1 at 87 [Summer, 1980]). As a result, it made sense when a delegate pronounced "that, as a rule, he did not think it for the public interest to select for judges men who were more than forty or forty-five years of age" (2 Lincoln at 254).
When the mandatory retirement age was enacted, 70 was considered to be such an extreme age that allowing judges to serve until age 70 was considered the equivalent of giving them lifetime tenure: "The majority of the judiciary committee had agreed on a life tenure, or, rather, on a tenure during good behavior, and ending, in any event, when the judge should become seventy years of age" (id. at 251). A mandatory retirement age of 70 would not ensure that judges back in 1869 did not have lifetime tenure on the bench. That was ensured instead by setting a term of office for judges and justices (see id. at 255-258; NY Const art VI, § 13 [1869]), not by forcing judges and justices to retire at what would be a highly unusual age for them to attain at that time.
Today, however, average life expectancy at birth is 79 years (Jiaquan Xu, et al., Mortality in the United States, 2024, NCHS Data Brief, No. 548 [Jan. 2026], available at https://dx.doi.org/10.15620/cdc/174641 [accessed June 16, 2026])—nearly four decades longer than in 1869. A man who today reaches 70 years of age can expect to live on average 14 more years (see U.S. Department of Social Security, Period Life Table, 2022, as used in the 2025 Trustees Report, available at https://www.ssa.gov/oact/STATS/table4c6.html [accessed June 5, 2026]). A woman that age can expect to live an additional 16 years on average (see id.).
Nevertheless, New York's Constitution, article VI, § 25 (b), still mandates retirement for certain judges and justices the year they turn 70:
"Each judge of the court of appeals, justice of the supreme court, judge of the court of claims, judge of the county court, judge of the surrogate's court, judge of the family court, judge of a court for the city of New York established pursuant to section fifteen of this article and judge of the district court shall retire on the last day of December in the year in which he or she reaches the age of seventy" (emphasis added).
Article VI, § 25 (b), now also provides that, even if a judge or justice is certified to continue on the bench until after the age of 70, they "shall serve no longer than until the last day of December in the year in which he or she reaches the age of seventy-six . . . ."
Notably, in the 1980s, this Court rejected challenges to article VI, § 25 (b), brought by litigants claiming it violated the Fourteenth Amendment of the U.S. Constitution. This Court held that age is not a suspect class for purposes of equal protection, and the mandatory judicial retirement age survives rational basis review (see Diamond v Cuomo, 70 NY2d 338 [1987]; Maresca v Cuomo, 64 NY2d 242, 250-252 [1984]). But a major change occurred since then that [*7]has validly called into question whether article VI, § 25 (b), is still viable under our State's Constitution.
II.
One week after the Supreme Court decided Dobbs v Jackson Women's Health Org. (597 US 215 [2022])—"tak[ing] away" "a woman's right to decide for herself whether to bear a child" (id. at 359, 403 [Breyer, Sotomayor, and Kagan, JJ., dissenting]—Governor Kathy Hochul called a special session of the legislature and declared that "New York State will take an unprecedented step toward enshrining the fundamental right to abortion access into our State Constitution" (see https://www.governor.ny.gov/news/governor-hochul-announces-extraordinary-session-new-york-state-legislature-enshrine-equal [accessed June 16, 2026]). The legislature responded by passing a concurrent resolution proposing the Equal Rights Amendment (ERA), which was duly enacted in 2024.
The ERA amended the Civil Rights Clause of article I, § 11, of New York's Constitution and added a second subdivision to that section. The changes made to the Civil Rights Clause included adding a number of new protected classes, so that the clause now protects against discrimination in civil rights based on "race, color, ethnicity, national origin, age, disability, creed, religion, or sex, including sexual orientation, gender identity, gender expression, pregnancy, pregnancy outcomes, and reproductive healthcare and autonomy" (NY Const, art I, § 11 [a]). In addition, the phrase "pursuant to law" was added to the end of the clause (see id.). Finally, the new subdivision (b) provides,
"Nothing in this section shall invalidate or prevent the adoption of any law, regulation, program, or practice that is designed to prevent or dismantle discrimination on the basis of a characteristic listed in this section, nor shall any characteristic listed in this section be interpreted to interfere with, limit, or deny the civil rights of any person based upon any other characteristic identified in this section" (id. § 11 [b]).
III.
Petitioners are three New York Supreme Court Justices who were subject to the mandatory retirement or certification process mandated under article VI, § 25 (b). They commenced this action alleging that the ERA nullified the constitutional mandatory retirement age of 70 for certain judges and justices. Supreme Court dismissed the proceeding, rejecting the argument that the ERA repealed the mandatory retirement age by implication. The court held that "[p]etitioners have not adequately demonstrated that Section 25 (b) was repealed by the ERA simply because it contains an age-based restriction, nor have they demonstrated that there was a legislative intent to repeal Section 25 (b) or any judicial retirement provisions with the ERA" (2025 NY Slip Op 34484 [U], at 6 [Sup Ct, New York Cty, 2025]). Petitioners appealed.
The Appellate Division, First Department, affirmed (247 AD3d 502 [1st Dept 2026]). The Court concluded that "article VI, § 25 (b) of the State Constitution has not been repealed and that Judiciary Law §§ 23 and 115 are not unconstitutional" (id. at 502). The Appellate Division further held that the plain language of the ERA does not support the argument that article VI, § 25 (b), has been implicitly repealed, inasmuch as the "ERA contains no reference to article VI, the eligibility of persons to serve as judges or justices, or the judicial retirement age" (id. at 502).
IV.
The majority of our Court today, affirming the Appellate Division, agrees with the Attorney General's contention that there is no basis in text, legislative history, or elsewhere supporting a holding that the ERA expressly or implicitly repealed the mandatory retirement age set forth in article VI, § 25 (b). I agree with the outcome reached by the majority, but I write separately because the majority's reasoning is incomplete.
It is well settled that "an amended Constitution must be read as a whole and as if every part had been adopted at the same time and as one law, and effect must be given to every part of it, each clause explained and qualified by every other part" (People ex rel. Killeen v Angle, 109 NY 564, 575 [1888] [quotation marks omitted]). For this reason, the [*8]lack of express language in an amendment repealing an earlier provision "gives rise to a presumption that repeal was not intended" (Cimo v State, 306 NY 143, 148-49 [1953]).
This presumption is not conclusive, however. What it means is that, in interpreting the Constitution, "all its provisions relating directly or indirectly to the same subject must be read together and any amendment in conflict with prior provisions must control, as it is the latest expression of the people" (People ex rel. Williams Eng'g & Contr. Co. v Metz, 193 NY 148, 157 [1908]).
What does it mean for an amendment to be in conflict with a prior provision? As Chief Judge Nelson explained it, a conflict occurs where there is a "repugnancy or contradiction" between the prior law and a latter law (Bowen v Lease, 5 Hill 221, 226 [Sup Ct 1843]). "If the two are repugnant, of course the last act governs, upon the principle that it is presumed to express the last intention of the makers" (id. at 226 n a). When determining if such a repugnancy exists between two provisions,
"[t]he real intention will always prevail over the literal sense of the terms. The context, the occasion, and the object of the law are to be considered, and a [law] will not be held repealed by implication if a reasonable construction will enable it to stand consistently with the alleged repealing [law]" (Davis v Supreme Lodge Knights of Honor, 165 NY 159, 167 [1900]).
I accept these basic premises, but I disagree with the majority that we can simply look at the provisions at issue in this case the way we would look at a conflict between two statutes or between a statute and our Constitution, even though generally the analyses are the same. This case is different because it involves a conflict between two provisions of our Constitution. In that situation, the test for finding implicit repeal of an earlier provision by a latter provision is more demanding: "A repeal by implication is not favored even in regard to a statute, still less can it be favored in regard to any provision of our organic law. It is, however, a question of intention in both cases" (People ex rel. Carter v Rice, 135 NY 473, 496 [1892] [emphasis added]). This heavy burden is what results in the failure of petitioners' claims.
The ERA provides that all discrimination "pursuant to law" against people "in their civil rights" because of "age" is prohibited. Based solely on the text of the ERA, the age restriction in article VI, § 25 (b), discriminates "pursuant to law" against people "in their civil rights" because of their age. Consequently, as a purely textual matter, the age restriction in article VI, § 25 (b), is prohibited under the ERA, meaning that it is repugnant to the ERA's dictate that "[n]o person" be subject to "any discrimination in their civil rights" "because of . . . age."
Under our precedent, however, we cannot simply look to the text of these conflicting constitutional provisions to determine if one is implicitly repealed by the other. As mentioned, when considering the issue of implicit repeal, "[t]he real intention will always prevail over the literal sense of the terms," which means that "the context, the occasion, and the object of the law are to be considered" (Davis, 165 NY at 167). For reasons discussed in more depth later in this opinion (see infra at 21-23), I agree with the majority that petitioners have failed to establish clearly that article VI, § 25 (b), violates the ERA's protection against discrimination "pursuant to law" on the basis of age and that, as a result, petitioners' challenge to the sections of the Judiciary Law implementing article VI, § 25 (b), also fail. Nevertheless, I write this concurrence to address issues that I believe the majority should have confronted head-on.
V.
To begin with, the majority has unfortunately failed to address the Attorney General's argument that, even after being amended by the ERA, the Civil Rights Clause still prohibits discrimination by state and private actors "only as to civil rights which are elsewhere declared by Constitution, statute, or common law" (People v Kern, 75 NY2d 638, 651 [1990] [emphasis added]). The majority's reason for ignoring this issue is unpersuasive. Like the Appellate Division, the majority has "decline[d] to reach the issues of whether the ERA made the Civil Rights Clause of article I, § 11 self-executing," because those issues are "academic in light of our determination" (majority op at 7-8, quoting 247 AD3d at 504 [internal quotation marks omitted]; see id. at 8 n 4).
That is incorrect. We hold today that petitioners have failed to meet their heavy burden of proving that the ERA, which amended the Civil Right Clause, is clearly antagonistic to the mandatory retirement provision in article VI, § 25 [*9](b). In order to make that determination, this Court needed to decide what the words of the Civil Rights Clause mean after being amended by the ERA. If the words mean what the Attorney General contends, and do not create enforceable civil rights, then it is unnecessary for us to analyze whether the newly amended Civil Rights Clause is antagonistic to article VI, § 25 (b). It is only because the language of the post-ERA Civil Rights Clause creates enforceable civil rights that we must determine whether those rights conflict with article VI, § 25 (b). Otherwise, it would be our holding today that is academic. But our holding is not academic precisely because the ERA has ingrained anti-discrimination protections into the Civil Rights Clause that are enforceable against the government.
The majority basically says as much by recognizing that,
"[a]ccording to the Senate and Assembly sponsors, the ERA was intended 'to ensure that [the] State Constitution extends to all New Yorkers, particularly those who have faced severe and pervasive injustice, the right to be free from discrimination.' The ERA was designed to achieve this aim 'by expanding the list of classes affirmatively protected by the New York Constitution in recognition of the need for comprehensive, enforceable, and intersectional equality under the law' and 'guarantee[ing] the validity of efforts to prevent or dismantle structural forms of inequality or discrimination against protected classes' " (majority op at 5-6 [citations omitted and emphasis added]).
I therefore feel compelled to write this concurrence explaining how the ERA amended the Civil Rights Clause so that it now contains enforceable—i.e., self-executing—rights protecting against discrimination by the State on the basis of the suspect classifications listed therein.
The Attorney General's contrary position would undermine the entire purpose of the ERA, which is "to promote equality of opportunity" for the protected classes of people listed therein "both by banning [such] discrimination and by affording enforceable legal rights to [such] people" (Senate Introducer's Mem in Support of 2023 NY Senate Bill S108-A, at 3 [emphasis added]). To understand why this is so, it helps to understand the history of the Civil Rights Clause.
Article I, § 11, the first antidiscrimination provision enshrined in our State's Constitution, was a product of the 1938 Constitutional Convention (see Peter J. Galie & Christopher Bopst, The New York State Constitution 84 [2d ed 2012]). It consisted originally of two sentences, and it remained substantially in its original form until the adoption of the ERA:
"No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed, or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."
The section's first major test came in Dorsey v Stuyvesant Town Corp. (299 NY 512 [1949]), a case involving racial discrimination in housing. This Court stated that the first sentence in article I, § 11, is an Equal Protection Clause no broader than its federal counterpart in the Fourteenth Amendment (see id. at 530). The Court based this interpretation on the plain language of the provision and the explicit statements of H.E. Lewis while he was serving as Chairman of the Bill of Rights Committee at the 1938 Convention (see id.). Specifically, quoting Lewis, this Court explained that "the first sentence of section 11 'in effect embodies in our Constitution the provisions of the Federal Constitution which are already binding upon our State and its agencies' " (id., quoting 2 Rev Record of N.Y. State Constitutional Convention, 1938 [2 Conv] 1065).
This Court further ruled in Dorsey that the second sentence of article I, § 11, is a Civil Rights Clause, which "protects only against 'discrimination in . . . civil rights,' " stating that "[o]bviou[sly] such rights are those elsewhere declared" (299 NY at 531). In reaching that conclusion, this Court again relied upon the remarks Lewis made at the 1938 convention "to the effect that the provision in question was not self-executing and that it was implicit that it required legislative implementation to be effective" (id., citing 2 Conv 1144). Indeed, the convention rejected language for article [*10]I, § 11, that would have required the legislature to "enact the appropriate laws to make effective the principles hereby declared" (2 Conv 1142) after Lewis argued that it is "implicit in the Constitution" that a provision "such as this, in order to be effective, must be carried out in some form by legislative enactment" (id. at 1144; see id. at 1069 ["In the employment field, we hope that the constitutional provision now before us will be implemented by proper legislation" (Sen. Robert F. Wagner)]).
Interestingly, "in civil rights" does not appear to have been included in the original proposed language for article I, § 11. Lewis had subsequently proposed those words "to limit [section 11's] scope" and "relieve [it] of criticism, some of which has been justly hurled against it" (3 Conv 2626). Lewis explained the new limitation: "The words civil rights are defined as those rights which appertain to a person by virtue of his citizenship in a state or community, and the civil rights are the rights which are found in the Constitution, in the Civil Rights Law and in the statutes" (id.). Immediately thereafter, the convention unanimously approved article I, § 11 (see id. at 2626-2628). The Court in Dorsey recognized this limitation and concluded that racial discrimination in housing was not barred by the Civil Rights Clause because the opportunity to acquire real property was not a recognized civil right, inasmuch as bills to create such a right failed to pass the legislature in 1947 and 1948 (see 299 NY at 548-549).
Four decades later, in People v Kern (75 NY2d 638 [1990]), this Court rejected the need for enabling legislation in a different context. The defendant in that case, who was charged in a racially motivated homicide, asserted a right to use his peremptory challenges to exclude persons of a particular race from serving on the jury (see id. 642-643). This Court ultimately concluded that the practice is prohibited by the Civil Rights Clause and the Equal Protection Clause (see id. at 643). Although the defendant argued that the Civil Rights Clause did not apply because "no statute prohibits the exercise of racially discriminatory peremptory challenges" (id. at 651), this Court refused to interpret the Civil Rights Clause "so narrowly" that it "prohibit[s] private discrimination only where such discrimination was already expressly prohibited by statute" (id.). There need only be "a 'civil right' 'elsewhere declared' " (id.), and jury service is a civil right long recognized in the Constitution and by statute (see id. at 651-652). As a result, this Court held that the Civil Rights Clause prohibits racial discrimination in the exercise of peremptory challenges (see id. 653).
With the passage of the ERA, we no longer must search outside of the confines of the Civil Rights Clause to determine which rights are protected under it. The clear intent behind the ERA was to create new rights and to make the Civil Rights Clause self-executing against the government.
Although from a textual standpoint the ERA appears to leave equal protection as it existed before, the Sponsor's Memorandum in Support demonstrates that the ERA addressed equal protection concerns by amending the Civil Rights Clause. "Our modern vision of equality demands comprehensive equal protection," it says in the justification section (Senate Introducer's Mem in Support of 2023 NY Senate Bill S108-A, at 1). Furthermore, although the ERA has retained the "in civil rights" language, the Sponsor's Memorandum indicates that the language was no longer meant to have the limiting effect on civil rights that it did before. Because "the right to abortion is central to a pregnant person's equality," the ERA "clarifies that any action that discriminates against a person based on their pregnancy, pregnancy outcome, reproductive healthcare, or reproductive autonomy is sex-based discrimination in their civil rights that would be explicitly prohibited by the State Constitution" (id. at 3 ["This amendment is intended to promote equality of opportunity for people with disabilities both by banning disability discrimination and by affording enforceable legal rights to people with disabilities" (emphasis added)]).
The Sponsor's Memorandum for the ERA further explains that Dorsey declared the Civil Rights Clause to not be self-executing, but it interpreted that to mean "it requires specific executing legislation in order to establish a cause of action between private actors . . . or in actions for damages" (id. at 2). "However," the sponsor continued, "even in the absence of specific executing legislation, the section operates to prohibit the application of laws and governmental action that discriminate on the basis of an enumerated protected category" (id. [emphasis added]). In other words, "discrimination in civil rights" now means discrimination, period.
This is further borne out by the language added to the Civil Rights Clause by the ERA prohibiting discrimination "pursuant to law." Those words have fundamentally shifted the inquiry under the Civil Rights Clause. As the Sponsor's [*11]Memorandum to the ERA discusses, "pursuant to law" was added for the purpose of "clarifying" that the Civil Rights Clause applies to any government action "with force of law, including action by the executive or legislative branch, local governments, or any subdivision thereof" (id. at 2). Gone is the time when the Civil Rights Clause depends on the existence of rights "elsewhere declared." The Clause now declares rights.
Indeed, the ERA would be ineffective if we failed to recognize this shift in understanding of the Civil Rights Clause. Otherwise, if a future legislature were to make abortion a crime, the State could argue that the application of the Civil Rights Clause depends on the existence of a right elsewhere declared, and abortion rights are declared nowhere, particularly if there is a statute making it a crime. That hypothetical argument would be consistent with our case law prior to passage of the ERA, but it is certainly not consistent with the Civil Rights Clause post-ERA. As a result, the only way to interpret the ERA as having effectively enshrined abortion rights in the Constitution is to say that by listing "pregnancy, pregnancy outcomes, and reproductive healthcare and autonomy" as protected classes or categories, the ERA created new civil rights.
It would make little sense to limit those new, self-executing, rights to abortion and reproductive rights, because the language of the newly amended clause is so much broader than that. Given that other suspect classifications—including race, color, ethnicity, national origin, age, disability, creed, religion, sex, sexual orientation, gender identity, and gender expression—are listed in parallel with pregnancy and reproductive rights, with no category of rights given precedence over another, we should hold that our prior precedent interpreting the Civil Rights Clause is no longer relevant to any of those rights. The Civil Rights Clause, as amended by the ERA, now grants people the self-executing right not to be discriminated against, "pursuant to law," on the basis of the categories set forth therein. The people of this State voted for those rights when they ratified the ERA. They were told how protective it would be of abortion and reproductive rights, and nothing in the text or history of the ERA indicates that any of the other rights created therein would receive lesser protection—including the right not to be discriminated against on the basis of age.
VI.
I also write to express my disagreement with the majority shrugging off the mandatory retirement provisions in article VI, § 25 (b), as a mere "age-related employment eligibility requirements for a discrete group of judges and justices" (majority op at 12). Imagine if, instead of an age restriction, article VI, § 25 (b), required judges to resign if they became pregnant or changed their sexual orientation, gender identity, or gender expression. In that scenario, I would hope that we would readily conclude that the ERA conflicts with that earlier provision of our Constitution, and we would not tolerate that discriminatory provision on the ground that it is a mere "employment eligibility requirement[]" (id.). Consequently, calling the mandatory retirement age in article VI, § 25 (b), an "employment eligibility requirement[]" does nothing to address the fundamental concern here, which is whether that provision is so repugnant to the ERA that we must deem it to have been implicitly repealed (id.).
VII.
Determining whether an amendment to a constitution implicitly repeals older provisions in that same document is not as simple as the majority makes it seem. We should not, as the majority does, base heavily our determination on the fact that "article VI, § 25 (b) provides specific age-related employment eligibility requirements for a discrete group of judges and justices," whereas "article I, § 11, as amended by the ERA, . . . sets forth a broad equality provision applicable to all New Yorkers" (majority op at 12).
Our decision in People ex rel. Carter v Rice, cited numerous times by the majority, makes this clear. In that case, this Court decided "the question as to the validity of the apportionment act of 1892" under New York's Constitution (135 NY 473, 482-83 [1892]). As is relevant, one of the reasons why it was claimed that the act violated our State's Constitution was that the apportionment of senate districts was "not based upon an equal number of inhabitants, excluding 'persons of color not taxed,' " as required under article III, § 4, of the State Constitution of 1874 (id. at 494). Prior to 1874, the Constitution's reference to " 'persons of color not taxed . . . ' refer[red] to the colored persons not taxed, as provided for in the preceding article, limiting their right to vote, and providing for their exemption from direct taxation, unless owners of real estate" (id.). As this Court explained, "The framers of the [pre-1874] constitution [*12]evidently thought that persons of color who were not entitled to vote [because they did not own sufficient taxable property] ought not to be counted in making up the number of inhabitants upon which to base the alteration of senate and assembly districts" (id.). By the time of the people's adoption of the 1874 Constitution, however, the Civil War had "commenced and came to an end" and "the 13th, 14th, and 15th amendments to the federal constitution were ratified" (id.). So, the draft of New York's new Constitution submitted to the people in 1874 "omitted the condition for the exercise of the elective franchise by the colored person, so that his right to vote was from that time placed upon the same foundation as that of the white inhabitant" (id. at 495). The condition was also omitted from article III, § 5, governing the apportionment of Assembly districts (see id.). Unfortunately, "[i]n some way not affecting this question[,] the amendment to section 4 of the same article, striking out the exclusion as to senate districts regarding persons of color not taxed, was not submitted to the people, and . . . remain[ed] as it was" (id.). Despite the fact that the exclusion of the "persons of color not taxed" language was in section 5, this Court held that the inclusion of that language in section 4 was implicitly repealed by the exclusion of that language from section 5 and an amended provision regarding the right to vote. In so holding, this Court explained,
"A repeal by implication is not favored even in regard to a statute, still less can it be favored in regard to any provision of our organic law. It is, however, a question of intention in both cases. The power that made can unmake.
A constitutional provision can be impliedly abrogated by the adoption of another and later one which is antagonistic to it, although the original provision may in terms remain unaltered. The later will of the people constitutionally made known must in such case take the place of the other provision, even though it may still in form remain in the organic law as a part thereof. It can only be said that in the case of the constitutional amendment, the fact of its opposition to a former provision and the intent to displace it by the amendment adopted must be so plainly shown by the provisions themselves that there can be no rational doubt in regard to it. I think these conditions are entirely filled by the proof showing the adoption of the amendments to section 1 of article 2, and to section 5 of article 3. I have no manner of doubt that the people intended by the adoption of these amendments to effectually blot out all distinctions of a political nature between white and colored persons, and I think these amendments taken in connection with the sections as they stood before amendment clearly show that such intention has been effectually accomplished so far as the Constitution is concerned.
In other words, the question of whether an amendment to the Constitution repeals by implication an existing provision is a question of whether the newer provision "is antagonistic to" the older provision. Although comparing the specificity of an amendment to an older provision can sometimes aid in answering that question, it can only do so when it is in service of determining whether there is an antagonism between the two provisions. Certainly, a broad prohibition on certain discriminatory behavior by the government must, by implication, repeal older provisions of the Constitution engaging in that same discriminatory behavior regarding a specific issue.
In fact, we have numerous examples in the U.S. Constitution of amendments of different levels of abstraction (i.e., both specific and broad provisions) implicitly repealing older provisions of varying levels of abstraction. Section two of the Fourteenth implicitly overrode article I, § 2, clause 3 (Three Fifths Compromise), without the latter being explicitly repealed. Article I, § 3, clauses 1-2 of the U.S. Constitution proclaim that state legislatures "shall" select members of the Senate, while the Seventeenth Amendment provides for the election of senators by the people, overriding by implication their selection by state legislatures. The Nineteenth Amendment gave women the right to vote. This implicitly overrode that part of section two of the Fourteenth Amendment allowing for the reduction of representation in the House of Representatives to those states who deny males, but not females, 21 years of age the right to vote.
Admittedly, some amendments in the U.S. Constitution are written in levels of abstraction similar to the [*13]provisions that they have implicitly repealed. But that is not true for all implicit repeals in our federal Constitution. Like the ERA, some amendments that have implicitly repealed existing provisions of the U.S. Constitution are conceptually far broader than the provisions they have implicitly repealed. For example, the U.S. Constitution still states, in a clause entitled "Fugitive Slaves," that "[n]o Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due" (U.S. Const., art. IV, § 2, cl. 3). Plainly, the Fugitive Slaves Clause is narrower in scope than the far broader provision that has implicitly repealed it: the Thirteenth Amendment.
As Professor Michael L. Smith explains in his article "Constitutional Interpretation and Zombie Provisions,"
"The Constitution does not contain the word 'slavery,' but these provisions reflect the existence of slavery in founding-era America and the compromises reached by the framers of the Constitution to allow the institution of slavery to persist. Though the Thirteenth Amendment was later enacted to prohibit slavery (with a significant exception for those being punished for crimes), and though the Fourteenth and Fifteenth Amendments set forth rights to equal protection and prohibitions on barring people from voting based on race, those amendments did not strike out or remove slavery-related provisions from the text of the Constitution itself. They remain, perpetually, as zombie provisions—their text overshadowing the gradual, troubled efforts of implementing the ideals of freedom, equality, and suffrage set forth in the text of the Reconstruction Amendments" (40 Ga. St. U. L. Rev. 603 [2024]).
The Fugitive Slaves Clause is no longer effective because the 13th Amendment outlaws slavery. That is true despite the prohibition against slavery in the 13th Amendment governing a far broader scope of behavior than the Fugitive Slaves Clause. As a general rule, a broad provision prohibiting all discrimination based on a suspect classification should repeal implicitly earlier provisions endorsing that discrimination in specific contexts.
This comparison of the 13th Amendment and the Fugitive Slaves Clause demonstrates that it is not merely the similarity in the breadth of two constitutional provisions that leads to implicit repeal. It is the repugnancy of the older provision to the amendment that causes an implicit repeal. Or, put another way, it is the antagonism of the amendment to an already existing provision that results in the provision's implicit repeal.
This of course might lead one to believe that we should hold that the ERA has implicitly repealed the mandatory retirement age in VI, § 25 (b). The problem is that unlike many other suspect classifications—such as race, sex, sexual orientation, gender identity, and pregnancy status—the reality of our mortality creates a compelling governmental interest in ensuring that at some point in the process of natural human decline there comes an age where we can reasonably say that judges should not continue to serve in that capacity.
Engaging in the legal fiction, as our precedent requires, of imagining that the two provisions were enacted at the same time, the mandatory retirement age appears eminently sound if we view the provision from the vantage point of the delegates in 1869. A man born in New York that year who lived long enough to turn 41 in 1910 would on average die by the time he was between 67 and 68 years of age, not even age 70 (see James W. Glover, Department of Commerce, Bureau of the Census, United States Life Tables 1890, 1901, 1920, and 1901-1910, at 162, available at https://www.cdc.gov/nchs/data/lifetables/life1890-1910.pdf [last accessed June 2, 2026]). It is hard to say that from the framers' point of view a 70-year-old age limit for judges would be repulsive to the ERA.
I posit that it is not the fact of a mandatory retirement age that is repulsive to the ERA. What concerns some about the retirement age is that it has not kept up with the times. Unlike race, sex, etc.—where laws discriminating against people on those bases are wholly contrary to our ideas of equality—age restrictions are judged by the degree of their discrimination. There are certainly age restrictions that people who voted for the ERA would support: e.g., voting age, driving age, or drinking age. When a legally mandated age restriction is discriminatory, it is so because of the degree of the restriction (set at either too high or too low of an age), it is not because there should never be age [*14]restrictions.
This leaves us at an impasse. We cannot rewrite this section of the Constitution to eliminate any age restriction, because we cannot say that, even today, there is no mandatory retirement age for judges that would pass heightened scrutiny. We also cannot insert into the Constitution a retirement age that we believe is appropriate. It is the exclusive job of the people and their representatives to decide what the proper mandatory retirement age should be. Thus, for petitioners, there is no remedy that can be had without this Court performing a role that goes beyond its constitutionally delegated function. For that reason, there is no remedy available to petitioners from this Court, inasmuch as petitioners have not presented sufficient proof that the ERA is antagonistic to article VI, § 25 (b), so as to overcome the presumption against implied repeal. I agree with the majority's reasoning to that effect (see majority op at 8-13). As a result, the remedy for petitioners' complaint is solely in the hands of the people of this State and their representatives. Only the people can amend the Constitution. If there is to be a change to the mandatory retirement age for certain judges and justices, it must be made by the people as a whole, not by the judges of this Court.
That said, I write this concurrence to expound on the majority's reasoning today in deciding this difficult case. We should not simply pay lip service to legal doctrines that are more complex than the majority lets on. Doing so fails to take seriously the rights created by the ERA. This case was an opportunity for the Court to state definitively that the ERA amended the Civil Rights Clause to create rights that can be enforced without the need to resort to some other source. That would have allowed the people of this State to remain confident in the protections against discrimination that they voted into our Constitution. Instead, the majority chooses to delay the promise of the ERA and to roll out its protections slowly "with all deliberate speed" (Brown II, 349 US 294 [1955]). In the meantime, litigants, most of whom never make it to this Court, may be subject to interpretations by lower courts that are demonstrably wrong, inasmuch as those lower courts may not recognize the self-executing nature of the Civil Rights Clause, as amended by the ERA. That is unfortunate.
Order affirmed, without costs. Per Curiam Opinion. Judges Rivera, Garcia, Cannataro and Halligan concur. Judge Troutman concurs in result in an opinion. Chief Judge Wilson and Judge Singas took no part.
Decided June 18, 2026

Footnotes

Footnote 1
The mandatory retirement age provision was moved to article VI, § 12 in 1894, to article VI, § 19 in 1925, and lastly in 1961, to where it is currently found in article VI, § 25 (b).

Footnote 2
OCA administratively enforces the judicial retirement and certification requirements. OCA appeared in this case only to oppose petitioners' request for preliminary injunctive relief and has taken no position on the merits of petitioners' claims.

Footnote 3
Judiciary Law § 23 states, "No person shall hold the office of judge, justice or surrogate of any court, whether of record or not of record, except a justice of the peace of a town or police justice of a village, longer than until and including the last day of December next after [they] shall be seventy years of age, except that a judge or justice in office or elected or appointed to office at the effective date of this section, as to whom no provision limiting [their] right to hold office to the close of the year following his attaining the age of seventy years was applicable prior to the effective date of this section, may continue in office during the term for which [they] w[ere] elected or appointed." Judiciary Law § 115 sets forth a certification system for retired Justices of the Supreme Court. The statute provides that any Supreme Court justice, retired pursuant to article 6, § 25 (b) of the State Constitution, must satisfy an administrative board certification process in which they demonstrate their mental and physical capacity in order to continue serving on the bench. The certification is valid for only three renewable terms of two years. A certified judge or justice may serve in office no longer than the last calendar day in which they reach the age of seventy-six. Our holding on this appeal renders academic petitioners' Judiciary Law claims.

Footnote 4
Because we reach the same conclusion, we have no occasion, unlike the concurrence, to address petitioners' remaining issues (see concurring op at 2, 9-10, 13-16, 21-23).

Footnote 5
Even though members of this Court may be affected by the outcome of this matter, we are required to hear and dispose of this appeal under the Rule of Necessity, "inasmuch as this [C]ourt has exclusive jurisdiction under the Constitution to hear this appeal (art VI, § 3, subd b, par [1]) and no other judicial body exists to which this appeal could be referred for disposition" (seeMaresca v Cuomo, 64 NY2d 242, 247 n 1 [1984]).